Syed ABDULLAH, et al., Plaintiffs,

v.

IMMIGRATION AND
NATURALIZATION SERVICE,
Defendant.

Jainal ABEDIN, et al., Plaintiffs,

v.

IMMIGRATION AND
NATURALIZATION SERVICE,
Defendant.

Nos. 92 CIV 8199 (AGS),
93 CIV 3985 (AGS).

United States District Court,
S.D. New York.

March 29, 1996.

Robert A. Murtha, Jr., New York City, for plaintiffs.

James O'Brien, III, Assistant United States Attorney, U.S. Department of Justice, Civil Division, New York City, for defendant.

## OPINION AND ORDER

SCHWARTZ, District Judge:

The above-referenced consolidated action is before the Court on defendant's motion to dismiss the complaint for lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted, or, in the alternative, for summary judgment, and plaintiffs' cross-motion for summary judgment. For the reasons stated herein, defendant's motion is denied and plaintiff's cross-motion is granted to the extent set forth below.

## BACKGROUND

Plaintiffs are more than 400 illegal aliens from India or Pakistan who challenge the defendant's adjudication of their applications for Special Agricultural Worker status under the Immigration Reform and Control Act of 1986 (the "Act" or "IRCA")[1] as being violative of the Act and of the Due Process clause of the Fifth Amendment to the United States Constitution.

The Act established, *inter alia*, the Special Agricultural Worker (SAW) amnesty program in recognition of the "special labor needs of Western growers of perishable commodities." H.R.Rep. No. 682(I), 99th Cong.,

2d Sess. 50, *reprinted* in 1986 U.S.C.C.A.N. 5649, 5654. The SAW program required the Attorney General to adjust the status of any alien farmworker who could establish (1) his or her admissibility in the United States as an immigrant and (2) that he or she had resided in the United States and performed at least 90 days of qualifying agricultural work during the 12–month period prior to May 1, 1986. The Act directed the Attorney General to adjust the status of these aliens first to that of special agricultural workers lawfully admitted for temporary residence and then to aliens lawfully admitted for permanent residence. *See* 8 U.S.C. § 1160(a)(2).

Aliens seeking SAW status were required to file an application, supporting documents and a fee with either an Immigration and Naturalization Service ("INS") legalization office ("LO") or a "qualified designated entity" ("QDE"), which, under the Act, included "qualified voluntary organizations and other qualified State, local community, farm labor organizations, and associations of agricultural employers." 8 U.S.C. § 1160(b)(2). Upon the submission of an application and fee, the applicant was ordinarily issued employment authorization, which was in effect until final action on the application was completed. *See* 8 U.S.C. § 1160(d)(2)(B).

Regulations adopted by the INS to administer the program provide for a personal interview of each applicant at an LO. *See* 8 C.F.R. § 210.2(c)(2)(iv) (1990). Under the Act, the applicant has the burden of proving, by a preponderance of the evidence, that he or she worked the requisite 90 days of qualifying agricultural labor. *See* 8 U.S.C. § 1160(b)(3)(B). If the LO examiner suspected that the application was fraudulent, he or she was expected to specify the level of suspicion of fraud on a scale of 1 to 5. Following the interview, the examiner would make a recommendation of approval or denial to an INS Regional Processing Facility ("RPF"), which reviewed the file and issued a decision. *See* 8 C.F.R. § 210.1(q). If the RPF intended to deny the application, a notice of intent to deny was sent to the applicant, who then had 30 days to submit further evidence in support of his or her application.

1. Pub.L. No. 99–603, 100 Stat. 3359.

If the final decision was a denial, the applicant was notified and advised of the right to appeal. On appeal, the applicant could submit "such additional or newly discovered evidence as may not have been available at the time of the determination" of the RPF. 8 U.S.C. § 1160(e)(2)(B). The appeal was reviewed first by the RPF. If the RPF determined that its original decision was correct, it forwarded the file to the Legalization Appeals Unit ("LAU") for a final written decision.

The Act mandates criminal penalties for making a fraudulent statement or supplying a fraudulent writing or document in connection with the filing of a SAW application. 8 U.S.C. § 1160(b)(7). Any person convicted of such a crime may be fined, imprisoned for up to five years, or both. Aliens convicted of fraud under the Act are excludable from the United States. *Id.*

Plaintiffs applied for SAW status, but their applications were ultimately denied by the LAU. They make the following claims regarding defendant's administration of the SAW program: (1) plaintiffs' applications were routinely denied because proof of their employment was based on documents provided by farm employers who were on an INS blacklist of persons either suspected or convicted of fraud in connection with SAW applications, with no showing that fraudulent documents were supplied to the individual applicant in question; (2) the INS unlawfully classified plaintiffs by their ethnic group identification within the Indian and Pakistani communities and recommended denial of applications on the basis of membership in ethnic groups predetermined to be suspected of fraud; (3) plaintiffs were not provided with competent interpreters at their LO interviews; (4) plaintiffs were not permitted to confront and cross-examine defendant's witnesses or to inspect the adverse evidence considered by defendant in denying their applications; and (5) the INS did not make any transcripts or recordings of the LO interviews, making it impossible to challenge defendant's accounts of the interviews in a meaningful way.

## DISCUSSION

### I. *Subject Matter Jurisdiction*

■ Defendant moves to dismiss the complaint for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1). Federal question jurisdiction would ordinarily cover the statutory and constitutional claims before the Court. *See Perales v. Thornburgh,* 967 F.2d 798, 805 (2d Cir. 1992). However, defendant argues that the Act's judicial review provisions are exclusive and deprive the Court of jurisdiction in this case. The Act provides for limited judicial review of the administrative denial of a SAW application, such that:

> (e)(1) There shall be no administrative or judicial review of a determination respecting an application for adjustment of status under this section except in accordance with this subsection.

> .    .    .    .    .

> (e)(3)(A) There shall be judicial review of such a denial only in the judicial review of an order of exclusion or deportation under section 1105a of this title.

8 U.S.C. § 1160(e)(1), (3)(A).

However, in *McNary v. Haitian Refugee Center, Inc.,* 498 U.S. 479, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991), an action brought to challenge the INS's procedures in administering the SAW program, the Supreme Court held that district courts have jurisdiction to hear constitutional and statutory challenges to INS procedures. *Id.,* 498 U.S. at 484, 111 S.Ct. at 892; *see also Rahim v. McNary,* 24 F.3d 440, 442 (2d Cir.1994) ("The district court properly exercised subject matter jurisdiction over the consolidated complaints on the ground that IRCA's limitation on judicial review does not preclude review of a challenge to the procedures used by the INS in implementing the statute"); *Jean v. Nelson,* 727 F.2d 957, 980 (11th Cir.1984) (en banc), *aff'd on other grounds,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985) (district court had jurisdiction over suit which alleged "widespread abuses by immigration officials" as pattern or practice violating the Refugee Act); *Haitian Refugee Center v. Smith,* 676 F.2d 1023, 1033 (5th Cir. Unit B 1982) ("insofar as the first three counts set forth matters

alleged to be part of a pattern and practice by immigration officials to violate the constitutional rights of a class of aliens they constitute wrongs which are independently cognizable in the district court under its federal question jurisdiction"); *compare Ahmed v. Meissner,* 896 F.Supp. 138, 141, n. 5 (S.D.N.Y.1995) (jurisdiction is lacking where "[e]ach plaintiff contends that the INS made specific errors in adducing and weighing the evidence set forth in his individual application").[2]

Thus, the question presented by defendant's motion is whether plaintiffs allege "a pattern or practice of procedural due process violations," *McNary,* 498 U.S. at 483, 111 S.Ct. at 892, by the INS in its administration of the SAW program, or, as defendant contends, plaintiffs' claims amount to a challenge of the INS's denials of their applications on their merits. The distinction the Court must draw is "one between the authority of a court of appeals to pass upon the merits of an individual deportation order and any action in the deportation proceeding to the extent it may affect the merits determination, on the one hand, and, on the other, the authority of a district court to wield its equitable powers when a wholesale, carefully orchestrated, program of constitutional violations is alleged." *Haitian Refugee Center v. Smith,* 676 F.2d at 1033.

In *McNary,* the plaintiffs alleged, *inter alia,* that the INS (1) imposed an unlawful burden of proof in cases of suspected fraud, by requiring applicants to produce corroborating evidence in addition to affidavits to prove the performance of the requisite 90 days of employment; (2) issued notices of denial which failed to state the specific reasons for denial and provided incorrect information for purposes of appeal; and (3) imposed an interview procedure which violated the applicants' Fifth Amendment right to due process by failing to provide interpreters, failing to allow the applicants to rebut adverse evidence, and refusing to allow the applicants to present witnesses on their own behalf. *Haitian Refugee Center, Inc. v. Nelson,* 694 F.Supp. 864, 866 (S.D.Fla.1988), *aff'd,* 872 F.2d 1555 (11th Cir.1989), *aff'd, McNary v. Haitian Refugee Center, Inc.,* 498 U.S. 479, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991). The district court found that these claims were beyond the scope of administrative review, as they attacked the manner in which the entire program was being implemented, and that "[t]o deny jurisdiction would be to allow illegal agency action to go unchallenged." *Id.,* 694 F.Supp. at 873–74. The Supreme Court agreed that the plaintiffs' claims amounted to allegations of a "pattern or practice of procedural due process violations," over which the district court had properly exercised jurisdiction. *McNary,* 498 U.S. at 483, 111 S.Ct. at 892.

Plaintiffs' allegations in this case are similar to those made in *McNary,* and this action, in essence, follows up on certain issues raised in that case. In *McNary* the district court ordered that the plaintiffs, who were unaware of the adverse evidence against their applications, be given an opportunity to examine the evidence, rebut it and offer additional evidence prior to a determination of their applications. *Haitian Refugee Center, Inc. v. Nelson,* 694 F.Supp. at 880. Here, plaintiffs claim that they have not been given the opportunity to examine the adverse evidence, and even though they were permitted to offer additional evidence to counter the INS's finding of suspected fraud, the presumption raised by the INS's finding was virtually irrebuttable. Further, the district court in *McNary* ordered that "[t]he Legalization Offices shall maintain competent translators, at a minimum, in Spanish and Haitian Creole, and translators in other languages shall be made available if necessary." *Id.,* 694 F.Supp. at 881. The Eleventh Circuit, in affirming this portion of the district

---

2. Several actions brought in this district against the INS, in which the plaintiffs alleged that the INS improperly weighed the evidence in their SAW applications, have been dismissed for lack of subject matter jurisdiction. *See Ahmed v. Meissner, supra; Basharath v. Meissner,* Order, No. 94 Civ. 226 (CBM) (S.D.N.Y. Sept. 16, 1994); *Malik v. Meissner,* No. 94 Civ. 8289 (SAS) 1995 WL 606772 (S.D.N.Y. June 20, 1995); *Nadeem v. I.N.S.,* Order, No. 94 Civ. 2617 (JES) (S.D.N.Y. July 19, 1995). These actions are distinguishable from the instant action due not only to the large number of plaintiffs in this case, but also to the claims they assert, most notably the claim that the INS employed a fraud profile based on ethnicity in adjudicating their applications.

court's order, stated that the provision was "properly tailored to meet the requirements of due process," but that the "if necessary" phrase did "not mean that interpreters in other languages shall automatically be required, absent court order, in the case of an [sic] non-English speaking applicant who speaks neither Spanish nor Haitian Creole." *Haitian Refugee Center, Inc. v. Nelson,* 872 F.2d at 1562, n. 13. Plaintiffs in this action allege that they were not provided with interpreters who could speak their native languages[3] and assert that aliens applying for SAW status have a due process right to be heard "in a meaningful manner." *Goldberg v. Kelly,* 397 U.S. 254, 267, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287 (1970). In addition, plaintiffs make the very serious allegation that, in denying their applications, the INS employed a profile of suspected fraud based on membership in an ethnic group.

Defendant argues that plaintiffs "list approximately 51 *different* categories in which their applications were denied, and assert chiefly *different* claims regarding each category rather than a pattern and practice." Defendant's Mem. of L. at 14. The different "categories" to which defendant refers, however, relate mainly to the various employers for whom plaintiffs claim to have worked. However, there is no meaningful distinction to be made, for example, between the 64 plaintiffs who claim that their applications were summarily denied because their putative employer was convicted of supplying one fraudulent document to a SAW applicant, and the 54 plaintiffs who claim that they were denied SAW status because a different alleged employer pled guilty to providing fraudulent documentation to applicants other than those plaintiffs. That the alleged employers are different people, and the fact patterns relating to each employer vary somewhat, is of no import. The plaintiffs in each of defendant's "categories" claim, *inter alia,* that their applications were improperly denied because of suspected fraud, even

though the INS had no specific evidence of fraud in their individual cases. Thus, regardless of the fact that plaintiffs do not share one employer and one fact pattern in common, they make the same substantive claim against the INS; to group their claims into artificial categories would elevate form over substance.

Defendant points to *Reno v. Catholic Social Services, Inc.,* 509 U.S. 43, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993), as authority for the proposition that the jurisdictional provision of the Act, which precludes judicial review of "a determination respecting an application," also precludes judicial review of challenges that merely refer to or rely on the denial of any individual application. Since plaintiffs refer the Court to documents in their application files as evidence of procedures violative of due process, defendant asserts that the procedural nature of their claims is only so much window-dressing for claims which seek to resolve the ultimate merits of their applications. In *Catholic Social Services, Inc.,* the Supreme Court reaffirmed its holding in *McNary,* stating

> We said that the reference to "a determination" describes a single act rather than a group of decisions or a practice or procedure employed in making decisions.... We therefore decided that the language setting the limits of the jurisdictional bar describes the denial of an individual application and thus applies only to review of denials of individual applications. The INS gives us no reason to reverse course, and we reject its argument that § 1255a(f)(1) precludes district court jurisdiction over an action challenging the legality of a regulation without referring to or relying on the denial of any individual application.

*Catholic Social Services, Inc.,* at 56, 113 S.Ct. at 2494–95 (citations and internal quotations omitted).[4] The Court did not state that a

---

3. Plaintiffs allege that a number of them, who speak Urdu or Bangla, were given interpreters who speak Spanish or Hindi, while others were not provided with any interpreter.

4. The Supreme Court held in *Catholic Social Services, Inc., supra,* that aliens challenging regu-

lations promulgated pursuant to IRCA were required to show that their claims were ripe by demonstrating that they had taken every affirmative step possible in applying for legalization but were blocked because of the challenged regulations. In that action, plaintiffs were two classes of aliens who were eligible for legalization, but

district court lacks jurisdiction if the challenge to the INS's practices and procedures in administering the Act refers to or relies on the denial of any individual application, and it is inconceivable that it would. If plaintiffs are precluded from offering the application files of individuals denied SAW status as proof of unlawful procedures employed by the INS, as defendant suggests, then they would be deprived of the ability to support their allegations with documentary evidence. We reject the contention that the law would countenance such a result.

Plaintiffs are not asking this Court to review their individual applications or to hear their testimony for the purpose of determining, on the merits, whether or not they are entitled to SAW status. Rather, plaintiffs challenge the patterns and practices utilized by defendant in its review process and request that the Court order defendant to readjudicate their cases employing constitutionally proper procedures that are consistent with the Act. *See Perales v. Thornburgh,* 967 F.2d at 807 ("even if we grant relief in this case, plaintiffs' success on the merits of their applications does not follow as a matter of course").

■■ Defendant also argues that plaintiffs' claim regarding the INS's failure to provide competent interpreters is not justiciable because plaintiffs did not raise this issue before the LO, the RPF and the LAU, thereby failing to exhaust their administrative remedies. Defendant concedes that due process claims are generally exempt from the exhaustion requirement because the agency does not have jurisdiction to adjudicate them, *see Bagues–Valles v. I.N.S.,* 779 F.2d 483, 484 (9th Cir.1985), but argues that where such a claim involves a procedural error correctable by the administrative tribunal, it must be presented and exhausted. *See Vargas v. I.N.S.,* 831 F.2d 906, 908 (9th Cir. 1987). Plaintiffs respond that the INS's failure to provide them with competent interpreters was not a procedural error, but an unconstitutional practice, and, in any event, administrative review would be futile.

■ In general, claims not raised in the administrative proceedings in question may be dismissed for failure to exhaust administrative remedies. *Correa v. Thornburgh,* 901 F.2d 1166, 1171 (2d Cir.1990). The justiciability doctrine is designed

> to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.

*Abbott Labs., Inc. v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). However, this requirement is excused under certain circumstances, including where administrative review would be futile, *see Honig v. Doe,* 484 U.S. 305, 327, 108 S.Ct. 592, 606, 98 L.Ed.2d 686 (1988), and where administrative action will not resolve the merits of the claim, as in a constitutional attack on administrative procedures. *Public Utilities Commission v. United States,* 355 U.S. 534, 539–40, 78 S.Ct. 446, 450–51, 2 L.Ed.2d 470 (1958).

The Eleventh Circuit addressed justiciability with regard to the plaintiffs' claims in *McNary.* The Court first found that the statutory requirement of exhaustion was inapplicable [5] because the plaintiffs did not seek substantive review of any individual ruling respecting their status, but challenged the adequacy of the procedures employed by the INS in administering the SAW program. *Haitian Refugee Center, Inc. v. Nelson,* 872 F.2d at 1561. Turning to the judicially-created exhaustion doctrine, the Court stated,

---

who had not necessarily applied for adjustment of status. *Id.,* at 46, 50, 113 S.Ct. at 2490, 2492. In contrast, plaintiffs in the instant action applied for SAW status and were denied by the LAU.

5. Section 1105a(c) of the Act provides that "[a]n order of deportation or of exclusion shall not be reviewed by any court if the alien has not exhausted the administrative remedies available to him as of right...." 8 U.S.C. § 1105a(c).

[e]xhaustion is not required, however, where the administrative remedy will not provide relief commensurate with the claim. The nature of plaintiffs' constitutional challenge of INS procedures is such that relief at the administrative review level would have been unlikely. The chances are remote that the INS would have considered substantial revision of the procedures devised for the processing of SAW applications at the behest of a single alien mounting a constitutional attack in the context of administrative review of her application. We therefore conclude that the exhaustion doctrine did not bar the district court's assertion of jurisdiction. . . .

*Id.,* 872 F.2d at 1561 (citations omitted).

We find this reasoning persuasive. Plaintiffs' claim that they were not provided with competent interpreters amounts to a constitutional attack. Defendant's assertion that the failure to provide competent interpreters was merely a procedural error is belied by the fact that the same "error" allegedly occurred in hundreds of cases. Moreover, defendant also takes the position that aliens applying for SAW status have no statutory or due process right to competent interpreters, demonstrating the futility of administrative review. *See El Rescate Legal Servs., Inc. v. Executive Office of Immigration Review,* 959 F.2d 742, 747 (9th Cir.1991) ("where the agency's position on the question at issue appears already set, and it is very likely what the result of recourse to administrative remedies would be, such recourse would be futile and is not required"). Finally, even if the Court applies the analysis articulated by the Supreme Court in *Abbott Labs., supra,* disregarding the exceptions to the justiciability doctrine, defendant does not prevail: the issue is fit for judicial decision, for it is of a legal, not factual, nature, and the plaintiffs would endure significant hardship were the Court to refuse to consider their claim. *Id.,* 387 U.S. at 149, 87 S.Ct. at 1515.

Accordingly, the Court finds that it has jurisdiction over all the claims asserted in this action, and defendant's motion to dismiss for lack of subject matter jurisdiction is denied.

## II. *The INS's Adjudication of the SAW Program*

■ Defendant moves to dismiss the complaint for failure to state a claim or, in the alternative, for summary judgment. Plaintiff cross-moves for summary judgment. Summary judgment is appropriate if the evidence offered demonstrates that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact, and all inferences and ambiguities are resolved in favor of the party against whom summary judgment is sought. *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994) (citations omitted).

### a. *Did the INS Employ an Improper Procedure in Denying Plaintiffs' Applications Based on Employer Fraud?*

■ Plaintiffs assert that the INS routinely denied any application which claimed employment for a suspect employer, notwithstanding any additional evidence that was submitted or the fact that there was no direct evidence of fraud in their particular applications. The INS contends that it properly relied on evidence such as the conviction records of alleged employers who had pleaded guilty to supplying fraudulent documents in other instances and who had provided documents in support of plaintiffs' applications, in determining that plaintiffs' evidence was not credible.

■ Plaintiffs have a constitutionally protected right to seek SAW status under the Act and corresponding regulations. *Perales v. Reno,* 48 F.3d 1305, 1313 (2d Cir.1995); *see also Haitian Refugee Center, Inc. v. Nelson,* 694 F.Supp. at 878. In *McNary,* the Supreme Court recognized that "[e]ven disregarding the risk of deportation, the impact of a denial on the opportunity to obtain gainful employment is plainly sufficient to mandate constitutionally fair procedures in the [SAW] application process." *Id.,* 498 U.S. at 491, 111 S.Ct. at 895. Moreover, due process "is violated when the government creates a right

to petition and then makes it utterly impossible to exercise that right." *Haitian Refugee Center, Inc. v. Nelson,* 694 F.Supp. at 878; *see also Haitian Refugee Center v. Smith,* 676 F.2d at 1039; *Rahim v. McNary,* 24 F.3d at 443 (due process requires that SAW applicants be "given a full and fair opportunity to establish their eligibility").

■■■■ In the adjudicative context, "due process entitles a person to factfinding based on a record produced before the decisionmaker and disclosed to that person, and an individualized determination of his interests." *de la Llana–Castellon v. I.N.S.,* 16 F.3d 1093, 1096 (10th Cir.1994) (citations omitted). The INS may not substitute "official notice" of evidence adverse to plaintiffs' applications in place of an analysis of the facts of each applicant's individual case. *Kaczmarczyk v. I.N.S.,* 933 F.2d 588, 594–95 (7th Cir.), *cert. denied,* 502 U.S. 981, 112 S.Ct. 583, 116 L.Ed.2d 608 (1991); *see also Castillo–Villagra v. I.N.S.,* 972 F.2d 1017, 1029 (9th Cir. 1992) (due process requires that applicant be allowed an opportunity to rebut officially noticed facts).

Plaintiffs claim that the INS adjudicated their applications using "procedure by presumption," rather than considering each application individually, in violation of their due process rights. *See Stanley v. Illinois,* 405 U.S. 645, 656–57, 92 S.Ct. 1208, 1215, 31 L.Ed.2d 551 (1972) ("Procedure by presumption is always cheaper and easier than individualized determination" but violates due process). Plaintiffs refer the Court to specific application files, such as that of Mr. Oliullah Badsha, as examples of defendant's alleged blacklisting of suspect employers.

Plaintiff Badsha's SAW application included an employment letter and work record from an alleged employer named Larry Marval. The LO examiner recommended denial of Badsha's application based on suspected fraud and checked the "Level of Suspicion" box denoting the highest level of suspected fraud. The examiner's notes read in their entirety:

The applicant fits the profile of highly suspect applicants who have been seeking legalization benefits as S.A.W.s, under Sect. 210 of I.R.C.A.

The documents submitted appear to be very similar in appearance as well as content. In most cases, the affiants themselves, growers or Farm Labor Contractors, have been listed as highly suspect in the Document Intelligence Alert Bulletins provided by E.R.P.F.

The documents submitted are signed and sworn to by one such growers/Farm Labor Contractors, namely by Larry Marval from N.J.

For this reason, I recommend that this application be denied as there is enough reason to suspect that the documents might be fraudulent.

Defendant's Ex. B at 375.

Consequently, the RPF informed Badsha that it intended to deny his application. In its letter to Badsha, the RPF stated,

Parry Del Rio Produce, Inc. owns the property at 318 Ward Avenue, Bordentown, New Jersey which is where Larry Marval claims a farm was operated by Royal Crest Meats. Officers of the corporation stated that neither Larry Marval nor Royal Crest Meats had a lease for the property at 318 Ward Avenue. The caretakers of the property stated that Larry Marval did not farm at 318 Ward Avenue.[6]

.    .    .    .    .

In addition, the dates on the employment letter signed by Larry Marval do not correspond with the alleged work record also signed by Larry Marval.

*Id.* at 373. The RPF informed Badsha that he could submit evidence to overcome its stated reasons for denial and a final decision would be rendered in 30 days. In response, Badsha apparently submitted "an alleged work record, not signed, and other various receipts and documents not in [his] name," which the RPF found to "have no probative value." *Id.* at 371. In denying Badsha's application, the RPF noted that Marval had

**6.** RPF notices of intent to deny sent to other plaintiffs who claimed to have worked for Larry Marval contain the same or similar language.

admitted supplying fraudulent SAW documentation and pled guilty to charges of conspiracy and making false statements. The RPF concluded that Badsha's evidence failed to establish that he resided in the area of the putative farm during the period of claimed employment or that he had performed the requisite employment, and "[n]o evidence was submitted with this case which would prove that adjoining property was utilized in connection with any alleged agricultural employment." *Id.* at 372.

On appeal to the LAU, Badsha asserted that Marval was forced to plead guilty to fraud and stated that a federal judge had granted Marval's motion to withdraw his guilty plea. Badsha submitted a photocopy of a picture of himself with Marval. The LAU dismissed his appeal, noting that Marval had since been convicted of conspiracy and making false statements, and that over one thousand sets of fraudulent documents on behalf of SAW applicants had been produced as a result of the "conspiracy orchestrated by Mr. Marval and others." *Id.* at 366.

The Act and corresponding regulations provide that an applicant may satisfy the burden of proof by providing either "documentation which shows qualifying employment," such as payroll records, or "documentation sufficient to establish the requisite employment or residence as a matter of just and reasonable inference," such as affidavits by agricultural producers, foremen, farm labor contractors, fellow employees, or other persons who have knowledge of the applicant's employment. 8 U.S.C. § 1160(b)(3)(B), 8 C.F.R. § 210.3(b)(1). The "inference to be drawn from the documentation provided shall depend on the extent of the documentation, its *credibility* and amenability to verification...." 8 C.F.R. § 210.3(b)(1) (emphasis supplied). An applicant's own testimony, uncorroborated by other credible evidence, is insufficient to meet the evidentiary burden. 8 C.F.R. § 210.3(b)(3). If the applicant establishes that he or she has performed the requisite qualifying employment as a matter of just and reasonable inference, "the burden then shifts to the Service to disprove the applicant's evidence by showing that the infer-

ence drawn from the evidence is not reasonable." 8 C.F.R. § 210.3(b)(1). With respect to the LO interview, the regulations provide that the "applicant must establish to the satisfaction of the examining officer during an interview that his or her claim to eligibility for special agricultural worker classification is *credible,* and that he or she is otherwise admissible to the United States...." 8 C.F.R. § 210.2(c)(4)(i) (emphasis supplied).

Thus, under the regulations, it is proper for the INS to assess the credibility of an applicant's evidence and apply that assessment in determining whether the evidence establishes the requisite employment by a just and reasonable inference. Badsha's application file certainly shows that the INS maintains some sort of list of employers suspected or convicted of fraud. This, in itself, does not violate plaintiffs' rights.

However, plaintiffs claim that once an alleged employer was determined to be suspect, the INS refrained from performing any further investigation and adamantly refused to grant any weight to any evidence offered by an applicant that might contradict its predetermined conclusion. Such a procedure, plaintiffs contend, violates both the Fifth Amendment and the "spirit and letter" of the Act, in that defendant created an irrebuttable presumption of fraud, yet found no specific evidence of fraud in their applications.

Plaintiffs point to the fact that Larry Marval pled guilty to fraud in connection with only *one* SAW application, and in his plea agreement with the government it was stipulated that Marval conducted farm operations and employed a number of aliens as farm laborers; yet, all plaintiffs claiming to have worked for Marval were denied SAW status. Moreover, in denying their applications the INS used the same or similar language evincing a lack of individualized examination.

Similarly, the alleged employer Lee Artis Breedlove, an established farm labor contractor, pled guilty to fraud in connection with providing SAW documentation. The INS discovered from payroll records provided to it as part of a plea agreement that Breedlove employed 260 aliens, and from these records

the INS determined that 10 employees had performed the requisite qualifying employment. Plaintiff Chowdhury Golam Baset was not among the ten. Baset submitted two letters of employment signed by Breedlove and argued that (1) he could not be responsible for the inaccuracies in the employment records maintained by Breedlove and (2) because he was clandestinely employed, he could offer no additional documentation such as pay stubs, W–2 forms and bank account receipts. In dismissing Baset's appeal, the LAU stated,

> [t]he Service acknowledges the fact that Mr. Breedlove was a farm labor contractor. However, given the detrimental information obtained by the Service, Mr. Breedlove's agricultural employment does not result in according veracity upon the applicant's agricultural employment claim. It is noted that the applicant's denial is not based on insufficient employment evidence but rather because the documentation submitted was deemed not credible.

Defendant's Ex. B at 1294.

Plaintiff Mohammed Islam also claimed that he was employed by Breedlove for at least 90 days during the statutory period. When the RPF notified Islam that it intended to deny his application because it did not consider affidavits and other documentation signed by Breedlove to be credible, Islam submitted five additional affidavits from individuals who attested to his agricultural employment and an additional affidavit signed by Breedlove. In the additional affidavit, Breedlove denied providing a list of his employees to the INS and stated that Islam worked for him for 90 days from May 1985 to May 1986. The RPF, and subsequently the LAU, acknowledged that Islam had submitted additional documentation, but found that he failed to "rebut or overcome the adverse evidence obtained by the Service...." *Id.* at 1232. Neither the RPF nor the LAU, however, described the additional documentation submitted by Islam, or explained why these documents were not credible or did not rebut the presumption of fraud created by Breed-

love's guilty plea. The RPF simply noted, "These documents do not overcome the previously mentioned derogatory information." *Id.* at 1241. The LAU explained that

> [t]here is no mandatory type of documentation required with respect to the applicant's burden of proof; however, the documentation must be credible. All documents submitted must have an appearance of reliability, i.e., if the documents appear to have been forged, or otherwise deceitfully treated or obtained, the documents are not credible.

> The adverse evidence acquired by the Service [i.e. Breedlove's payroll records] directly contradicts the applicant's claim to have performed qualifying agricultural employment for Mr. Breedlove at C.W. Hendrix Farm. This, combined with Mr. Breedlove's subsequent guilty plea and the applicant's inability to directly address or credibly rebut the adverse evidence acquired by the Service, conveys a strong appearance of unreliability on the part of the applicant's documentation. As such, the documentation submitted by the applicant initially and on appeal cannot be accepted as credible evidence meeting his burden of proof or overcoming the evidence acquired by the Service.[7]

*Id.* at 1233. The LAU's reasoning appears to have been the following: Islam was not able to "credibly rebut" the INS's adverse evidence, therefore the documents Islam submitted to rebut that adverse evidence were not credible.

Such circuitous reasoning reveals that, in at least some cases, defendant erected a presumption of fraud which was virtually irrebuttable. Once the defendant determined that an application was suspect because it relied on documents signed by noncredible individuals, defendant appears to have viewed all subsequently submitted evidence as equally noncredible, or tainted by a presumption of fraud. That Larry Marval or Lee Artis Breedlove are not credible affiants is not at issue, nor is the proposition that the Act and corresponding regulations allow de-

---

7. This or similar language appears in many of plaintiffs' LAU dismissals. *See, e.g.* Defendant's Ex. B at 801–02, 1073, 1153, 1190.

fendant to draw an inference from an applicant's evidence based on whether or not the evidence is credible and amenable to verification. However, the fact that an employer pled guilty to, or was convicted of, supplying fraudulent documents to SAW applicants must not result in an automatic denial of SAW status to aliens who did in fact perform the requisite employment for that employer. In other words, if Larry Marval did indeed provide fraudulent documents to only one SAW applicant, all 64 of the plaintiffs who claim to have worked for Marval cannot be that one applicant. Defendant is required to make a good faith effort to separate the fraudulent from the non-fraudulent applications, analyzing the facts of each applicant's individual case. *See Kaczmarczyk v. I.N.S.*, 933 F.2d at 594–95. In short, the presumption of fraud must not be irrebuttable.

■ Plaintiffs urge the Court to go one step further and hold that defendant must have specific evidence which shows that an applicant's documents are in fact fraudulent in order to deny SAW status. The Court declines to do so. The only case plaintiffs cite in support of this proposal is *Stanley v. Illinois, supra,* in which the Supreme Court stated that "procedure by presumption" violates due process. *Id.,* 405 U.S. at 656, 92 S.Ct. at 1215. However, this Court's holding that the INS's presumption of fraud must by rebuttable, not irrebuttable, satisfies the requirements of *Stanley.*

In *Stanley,* the Court struck down an Illinois statutory scheme which provided that the children of unmarried fathers, upon the death of the mother, were declared dependents of the State, without proof of neglect or a hearing as to the father's parental fitness. Under the statute, the unfitness of an unmarried father was presumed as a matter of law and not subject to challenge through the process of a hearing or the submission of evidence. The Court held that the statute's presumption of unfitness of an unmarried father violated the Due Process Clause of the

Fourteenth Amendment. *Id.,* 405 U.S. at 658, 92 S.Ct. at 1216.

In the instant action, plaintiffs are afforded the opportunity to present additional evidence to rebut the presumption of fraud raised by the INS's evidence which adversely affects the credibility of plaintiffs' previously submitted documents. Moreover, the presumption is factual, not legal, in nature. So long as it is not an irrebuttable presumption, which the Court herein holds that it may not be, plaintiffs' due process rights are not violated.

Plaintiffs also contend that to deny SAW status on the grounds of suspected fraud, without specific evidence that the application contains fraudulent documents, contravenes the intent of Congress in promulgating the Act. Plaintiffs rely on the following statement contained in House Conference Report No. 1000, pertaining to the burdens of proof set forth in the Act:

> ... courts have dealt with fact patterns involving employee loss of records, destruction or *falsification* of records by employers, and other difficult circumstances where precise evidence of hours worked is lacking.
>
> This problem is compounded in agriculture, where pay records may only show piece rate units completed. While this Act will require evidence of hours worked, the lack of hourly records for agricultural employees (which could result from small employer exemptions from wage and hour laws as well as from employment by farm labor contractors or others whose record-keeping practices are deficient), has led the Conferees to conclude that fairness dictates they create a presumption in favor of worker evidence, unless dispoved [sic] by *specific evidence* adduced by the Attorney General.[8]

H.R.Conf.Rep. No. 1000, 99th Cong., 2d Sess. 97 (1986), *reprinted* in 1986 U.S.C.C.A.N. 5840, 5853 (emphasis supplied).

8. The remainder of this paragraph reads, "This approach rejects any possibility that a mechanistic formula for translating piece rate units picked into hours worked could satisfy this subsection's requirements. Rather the Conferees intend the experience gained under the Fair Labor Standards Act to govern. If an alien is able to produce evidence showing only piece rate units picked, then any day on which piece rate work was performed shall be deemed to satisfy the man-day requirements to this Act."

It is well established that "[w]hen we find the terms of a statute unambiguous, judicial inquiry is complete except in rare and exceptional circumstances." *Demarest v. Manspeaker*, 498 U.S. 184, 190, 111 S.Ct. 599, 604, 112 L.Ed.2d 608 (1991); *see also Ardestani v. I.N.S.*, 502 U.S. 129, 135–36, 112 S.Ct. 515, 519–20, 116 L.Ed.2d 496 (1991) ("The starting point in statutory interpretation is the language of the statute itself.... The strong presumption that the plain language of the statute expresses congressional intent is rebutted only in rare and exceptional circumstances when a contrary legislative intent is clearly expressed"). Only where "the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters," may the Court "adopt[ ] a restricted rather than a literal or usual meaning of [a statute's] words ... [so as not to] thwart the obvious purpose of the statute." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982).

Such is not the case here. The language of the Act is not ambiguous and imposes no "specific evidence" requirement. Moreover, Congress easily could have included such language, had it so desired. Instead, it afforded the INS a certain amount of discretion in determining whether an applicant has met his or her burden of proof "as a matter of just and reasonable inference." 8 U.S.C. § 1160(b)(3)(B)(iii). The reasonableness of any inference depends to some extent on the credibility of the evidence submitted, as the Act's regulations mandate. The statute then provides that the burden of proof shifts to the Attorney General "to disprove the alien's evidence with *a showing which negates the reasonableness of the inference* to be drawn from the evidence." *Id.* (emphasis supplied). Congress did not require the Attorney General to show that an applicant's documents were themselves fraudulent or in error, but rather opted for a less stringent burden of negating the reasonableness of the inference.

Even if the Court looks to the passage in the House Conference Report noted above, that language does not clearly express a contrary legislative intent. *See Ardestani v. I.N.S.*, at 136, 112 S.Ct. at 520. The Confer-

ees were recommending an approach that "rejects any possibility that a mechanistic formula for translating piece rate units picked into hours worked could satisfy" the qualifying employment requirements. 1986 U.S.C.C.A.N. at 5853. The passage is not directly concerned with the issue of specific evidence of fraud raised in this action. In short, the Court declines to find that the language of the Act is ambiguous or contrary to legislative intent.

### b. *Did the INS Improperly Deny Plaintiffs' Applications Based on an Ethnic Profile?*

Plaintiffs allege that defendant "engaged in a *wholesale* pattern and practice of classifying plaintiffs by their ethnic group within the Indian and Pakistani communities, recommending denial and ultimately denying every application where defendant had predetermined, prior to any individual plaintiff ever setting foot in defendant's local office, that the *group* of which plaintiff was a member was either guilty of committing fraud or was suspected of having submitted fraudulent documentation." Plaintiff's Reply Mem. of L. at 3 (emphasis in original). Plaintiffs refer the Court to seven application files in which the LO examiners' notes include references to an Indian and/or Pakistani fraud profile. Defendant responds that plaintiffs' evidence is insufficient, and further argues that the LO's recommendations were not final. Defendant points out that there is no evidence that the RPF's or LAU's decisions reflect the usage of an ethnic profile.

The use of a fraud profile based on ethnicity unquestionably violates due process; that the applicants are illegal aliens is of no import. In *Bertrand v. Sava*, 684 F.2d 204 (2d Cir.1982), the Second Circuit stated that the discretion afforded the Attorney General by the Immigration and Nationality Act to deny parole to unadmitted aliens "may not be exercised to discriminate invidiously against a particular race or group...." *Id*, 684 F.2d at 212; *see also Jean v. Nelson*, 727 F.2d at 963 (remanding to district court for determination as to "whether lower-level INS officials have abused their discretion by discriminating on the basis of national origin in violation of facially neutral instructions

from their superiors"). In addition to the danger of discrimination, profiles based on race or ethnicity deprive applicants of the individualized determination of their interests to which they are entitled. *See Rhoa–Zamora v. I.N.S.*, 971 F.2d 26, 33 (7th Cir. 1992), *cert. denied*, 508 U.S. 906, 113 S.Ct. 2331, 124 L.Ed.2d 243 (1993). Similarly, in the criminal law context, ethnicity or race may not be viewed by law enforcement officials as an indicator of suspicious behavior. *See Whitfield v. Board of County Commissioners*, 837 F.Supp. 338, 344 (D.Colo.1993) ("Without particularization as to a specific person, transaction or incident, the naked inference would be that race correlates to criminal behavior. Such an equation of race with suspicious criminal activity would be nothing more than a racist assumption, and ... profile stops may not be predicated on unconstitutional discrimination based on race, ethnicity or state of residence"); *United States v. Restrepo*, 890 F.Supp. 180, 193 (E.D.N.Y.1995) (investigatory stop based on ethnicity and out of state license plate violated Fourth Amendment).

In light of the seriousness of plaintiffs' allegation, the Court sets forth herein the seven incidences of alleged ethnic profiling to which the plaintiffs refer in their submissions.

The LO examiner's notes regarding plaintiff Kawser Mustafa read in their entirety:

> The applicant fits the "profile" of highly suspect applicants of Indian/Pakistani nationality all coming from the region of Punjab. Due to past experiences involving the above applicants seeking legalization under Sect. 210 (SAW 2), we have reason to suspect that the documents presented by such applicants may have been obtained fraudulently. I recommend that this application be denied.

Defendant's Ex. B at 303. The examiner checked the box denoting the highest level of suspicion of fraud [9] and recommended denial of Mustafa's application.

Regarding the application of plaintiff A. Umer Din Robinson, the LO examiner wrote:

> claim entry without inspection across the Mexican border; claim employment in farm labor; —described process of planting in hot house, of harvesting and cultivating. —Alleged when he arrived in U.S. farming was the only work available since he has no papers. —Alleged he was dismissed in May and learned from other people from his country that construction labor is available; —because of similar pattern and profiles have been established on similar nationalities of Pakistan, recommend denial.

*Id.* at 592. In this case, the examiner recommended denial but did not check a "level of suspicion" box.

The LO examiner who interviewed plaintiff Zaman Shar Malik recommended denial of his application based on a level five suspicion of fraud. The examiner's notes on Malik read:

> The applicant fits the "profile" of highly suspect applicants of Indian/Pakistani/Bangladeshi/Sri Lankan nationality who, during the past several months have been steadily seeking legalization benefits under Sect. 210 of I.R.C.A. Based on the close similarity of the documents submitted, the dates of employment, always within the prescribed limits, the duration of the employment, almost always within the minimal range prescribed by the law, there is a strong suspicion that the applicants are not bona-fide applicants and that they may have obtained their documents through fraudulent means. I recommend that this application be denied.

*Id.* at 1014.

The examiner who interviewed plaintiff Ahmed Darbar noted that he submitted work records, affidavits of growers and an employer letter in support of his application. The examiner recommended denial, however, based on a level five suspicion of fraud, noting:

> The documentation is deemed suspect due to the following reasons. Farm related documents were obtained last week, letters are photo copied form letters and the applicant has no knowledge of farming. Ap-

---

**9.** There are five levels of suspicion, five being the highest.

plicant comes within a pattern of *Indian* citizens who claim they entered the U.S. in 1984 or 1985 and enter into agricultural labor for the minimum period of man days required to qualify for Group II SAW. Fraud highly suspected. *Recommend Denial.*

*Id.* at 972 (emphasis in original).

The LO examiner recommended denial of plaintiff Arshi Mahmood for suspected fraud at level four. After summarizing how the applicant came to be in the United States, the examiner wrote:

He said he harvested tomatoes, corn, squash and peppers. He said farm was big, he couldn't elaborate on size, but he said he worked with 50 people. Applicant said he lived on farm with 2 friends. Applicant said he is a sandwich man in a restaurant making $250 a wk. Applicant said he worked in the upholesty [sic] business in Pakistan. This case falls into fraud saw [sic] common in agric. workers from India & Pakistan.

*Id.* at 48.

Regarding the application of plaintiff Shahinshah Babar, the LO examiner did not recommend denial, but noted:

Due to the high incidence of fraud related to this phase of legalization, the fact that Subject is presently employed in industry other than agriculture and that Subject is of a particular ethinic [sic] group that is allegedly involved in obtaining fraudulent documentation to substantiate (his) claim for legalization, it is requested that a thorough review of this petition and all relating documents be conducted to ascertain the validity and veracity of said petition.

*Id.* at 283.

The LO examiner who interviewed plaintiff Ali Rafaqat recommended denial of his application based on a level four suspicion of fraud, but added that the recommendation should be reversed if fraud was not found. The examiner's notes read:

Denied—Suspected Fraud. Pattern has been developing with Indians & Pakis [sic] in agricultural work. Verify Employer.

*Id.* at 575.

The INS argues that plaintiffs have pointed to "a mere seven instances in which the LO mentioned that the applicant was a member of an ethnic group—Indian or Pakistani—that had demonstrated a pattern of submitting fraudulent SAW documents." Defendant's Reply Mem. of L. at 16. However, the Court finds that evidence of an ethnic profile exists in many more than these seven applications. *See, e.g.,* Defendant's Ex. B at 112 ("Applicant comes within profile of alien applicant from Punjab or India"); *id.* at 145, 3069, 8400, 9067 ("Subject is of a particular ethinic [sic] group that is allegedly involved in obtaining fraudulent documentation"); *id.* at 151 ("I recommend denial of this application because the applicant's application fits the profile of the other highly suspect Indian/Pakistan SAW applicants"); *id.* at 242, 3785, 4549, 8506 ("The applicant fits the "profile" of highly suspect applicants of Indian/Pakistani/Bangladeshi/Sri Lankan nationality who, during the past several months have been steadily seeking legalization benefits"); *id.* at 255 ("Applicant comes within profile of alien applicant from Punjab or India"); *id.* at 398 ("Applicant meets profile of India/Pakistan nationals applying for amnesty under Group 2 of the Special Agricultural Workers ... These applications are highly suspect and I recommending [sic] denial in this case"); *id.* at 6717 ("Application fits general profile of previously submitted fraudulent Punjabi applicants"); *id.* at 3436 ("Applicant fits the profile of the East Indians who are filing false applications"); *id.* at 4475 ("Per memo 9–28–88 this file to DAU since all Pakistani's claiming SAW eligibility from work in Texas are suspect"). Moreover, the fact that the examiners in some cases did not mention the word "profile" in their notes, does not necessarily mean that an ethnic profile was not at work in those cases as well. Undoubtedly, it is rare to find actual evidence of an impermissible profile, rather than having to analyze statistical evidence suggesting its existence.

In some application files, the LO examiner noted that specific documents submitted by the applicant appeared to be fraudulent; [10]

---

10. In such cases, the examiner noted that docu-   ments were photocopies or "form letters."

however, in many cases, the applicants' documents are not mentioned, much less analyzed, and the examiner recommended denial based entirely on the profile. For example, plaintiff Kawser Mustafa, Munir Hussain, Mohammad Arif, and Gurdip Josan all received recommendations of denial from the LO based on a level five suspicion of fraud. The examiner's notes in each case recite the exact same language, which bears repeating:

> The applicant fits the "profile" of highly suspect applicants of Indian/Pakistani nationality all coming from the region of Punjab. Due to past experiences involving the above applicants seeking legalization under Sect. 210 (SAW 2), we have reason to suspect that the documents presented by such applicants may have been obtained fraudulently. I recommend that this application be denied.

*Id.* at 434, 303, 4754, 5845. All of these applicants had submitted various documents, including passports, employer affidavits, and affidavits from growers, foremen, farm labor contractors, or union officials. The examiner did not refer to any of these documents specifically, but rather found them to be suspicious due to *past experiences* involving other applicants of *Indian and Pakistani nationality.*

Plaintiff Zaman Shar Malik's examiner referred to the submissions of *all* applicants fitting the "profile" and found that *all* such applicants "are not bona-fide applicants and that they may have obtained their documents through fraudulent means."[11] *Id.* at 1014. Therefore, without undertaking an analysis of this particular applicant's evidence, the examiner recommended denial of Malik's application based on a level five suspicion of fraud.

In short, the record strongly indicates that many of plaintiffs' applications were adjudicated by the LO, in whole or in part, with reference to a profile based on their identity with a particular group. Such adjudication violates our most basic principles and has no place in a process designed to afford an applicant a certain amount of individual consideration.

Defendant also argues, in essence, that since the LO's recommendations were not final decisions, any ethnic profiling that took place at the LO level is irrelevant. This argument lacks merit. Impermissible profiling at any level of the decision-making process is unconstitutional, and the fact that such profiling occurred at one level cannot but taint the entire process. Defendant presents no authority that would persuade the Court otherwise.

### c. Do Plaintiffs Have a Due Process Right to a Competent Interpreter?

■ Plaintiffs claim that their due process right to be heard "in a meaningful manner," *Goldberg v. Kelly,* 397 U.S. 254, 267, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287 (1970), was violated by the INS's engaging in a "wholesale pattern and practice" of not providing competent interpreters during plaintiffs' LO interviews. Plaintiffs' Reply Mem. of L. at 9. Defendant argues that neither the Due Process Clause, nor the Act and its regulations, require the INS to furnish competent translators to SAW applicants; and, in any event, plaintiffs have not shown how a lack of competent interpreters prejudiced their applications. Defendant further submits that "mere common sense would suggest that it was *plaintiffs* who bore the burden of bringing along someone with them at their legalization interviews who would interpret for them," because aliens who wish to be nationalized must learn to read English. Defendant's Reply Mem. of L. at 19 (emphasis in original), citing *Soberal–Perez v. Heckler,* 717 F.2d 36, 42 (2d Cir.1983), *cert. denied,* 466 U.S. 929, 104 S.Ct. 1713, 80 L.Ed.2d 186 (1984).

Plaintiffs claim that interpreters who spoke the same language as they do were present at only 21 interviews.[12] In the case of plaintiff Khadim Hussain, who speaks Urdu, the interview was allegedly conducted in Spanish; another plaintiff who speaks

---

**11.** See *supra* at 1094.

**12.** Each plaintiff has submitted an affidavit stating what language he or she speaks and whether or not there was an interpreter present at the LO interview who spoke the plaintiff's language.

Punjabi was apparently provided with an interpreter who speaks Urdu. *See* Abdullah Compl. at ¶ 11. Defendant submits the affidavit of John Cappiello, a supervisory legalization officer for the New York District LO, who declares that, "[i]n processing and adjudicating SAW applications, the New York District Legalization Office provided interpreters for those applicants who were determined to be not capable of speaking English. The interpreters that were provided for interviews in connection with SAW applications were competent to translate the language of the applicant being interviewed." Affidavit of John Cappiello, dated April 11, 1994. However, Cappiello does not state that he was present at plaintiffs' interviews, and, according to plaintiffs, he was present at only one such interview. Plaintiffs, on the other hand, have personal knowledge of what took place at their interviews.

■■■■ The Court is guided by the principle that "[t]he fundamental requisite of due process of law is the opportunity to be heard . . . at a meaningful time and in a meaningful manner." *Goldberg v. Kelly,* 397 U.S. at 267, 90 S.Ct. at 1020. Moreover, "[t]he opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard." *Id.,* 397 U.S. at 268–69, 90 S.Ct. at 1021.

■■■■ It is well established that "due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). Rather, due process is "flexible and calls for such procedural protections as the particular situation demands." *Id.* Therefore, in evaluating the procedures employed by the INS, we must evaluate (1) the interest at stake for the individual, (2) the risk of an erroneous deprivation of the interest through the procedures used and the probable value, if any, of additional or different procedural safeguards, and (3) the interest of the government in using the current procedures rather than additional or different procedures. *Id.,* 424 U.S. at 335, 96 S.Ct. at 903; *see also Landon v. Plasencia,* 459 U.S. 21, 34, 103 S.Ct. 321, 330, 74 L.Ed.2d 21 (1982). The Eleventh Circuit

applied these factors in *Haitian Refugee Center, Inc. v. Nelson, supra,* and found that

> [p]laintiffs' interest in establishing their entitlement to adjustment under the SAW program is plain. Evidence as to the second *Mathews* factor is equally persuasive. Without an adequate interpreter at the interview, the risk of an erroneous recommendation is unacceptably high. The ability of the adjudicator at the interview to make a reasonable assessment of the applicant's credibility is obviously hampered by his inability to understand the applicant's statements.

*Id.,* 872 F.2d at 1562. The Court further stated that a consideration of the third factor was unnecessary since the INS's procedures already contemplated the relief plaintiffs sought. Specifically, the Court noted that, "[t]he INS Examinations Handbook directs the examining officer to 'make certain whether the services of an interpreter are required' if the person being questioned does not speak English." *Id.* Accordingly, the Eleventh Circuit affirmed the district court's order requiring the LOs to "maintain competent translators, at a minimum, in Spanish and Haitian Creole, and translators in other languages . . . if necessary." *Id.,* 872 F.2d at 1562, n. 13.

■■■■ We find the Eleventh Circuit's reasoning in *Haitian Refugee Center, Inc. v. Nelson, supra,* persuasive. Particularly where credibility is at issue, it is vital that an applicant be able to understand the questions posed, and equally important that the examiner understand an applicant's responses. If an applicant does not speak and understand English moderately well, the "presence of a competent interpreter is critical to the fairness of a hearing." *Kotasz v. I.N.S.,* 31 F.3d 847, 850, n. 2 (9th Cir.1994); *see also Mentor v. I.N.S.,* 834 F.Supp. 133, 137 (E.D.Pa.1993) (the right to "be able to participate meaningfully by having the proceedings translated into a language he or she understands is fundamental"); *United States v. Mosquera,* 816 F.Supp. 168, 172 (E.D.N.Y.1993) ("To be 'present' implies more than being physically present. It assumes that a defendant will be informed about the proceedings so he can assist in his own defense").

The record shows that the LO examiners often inquired as to the applicants' knowledge of farming or of the farm on which the applicant claimed to have worked. If an examiner found the response to such inquiries to be inadequate, he or she tended to conclude that the applicant was not credible, whereas the applicant may have had difficulty expressing the answer in English. *See, e.g.,* Defendant's Ex. B at 738 ("applicant has no knowledge of farming"); *id.* at 487 (applicant "worked with squash—he said the color is *red* but could not describe the shape") (emphasis in original); *id.* at 4028 ("applicant doesn't have to [sic] much knowledge of employer"); *id.* at 4123 ("testimony is unbelievable he couldn't tell me much about this farm"); *id.* at 4527 (Applicant "could not describe how one would 'short a peach' or 'shovel a tree'"); *id.* at 8370 ("Subject was not convincing during the interview that he actually did farm work"); *id.* at 8575 (Applicant was "unable to explain farm work. Did not know process of planting, harvesting and cultivation"). In some cases, the LO examiner actually noted an applicant's inability to communicate, yet an interpreter was not provided. *See, e.g., id.* at 145 ("Applicant's knowledge of English extremely limited." Responded to simple questions with "farm work" or "Royal Crest Meats"); *id.* at 3659 ("Did not believe this woman had been in U.S. since 1985 as claimed, poor English for an Indian who's been here 3 years! ... I asked 3 times if she came 1 time only & left & she kept saying yes").

Under the circumstances of this case, the Court finds that plaintiffs have a due process right to competent interpreters, and the INS must make such interpreters available when necessary. Defendant argues that plaintiffs have not shown how competent interpreters would have enhanced their capability to address the INS's evidence of their employers' fraud. However, where an applicant's own credibility, with regard to his documentary evidence and oral statements, is pitted against evidence of an employer's fraud, it is clear that the applicant's ability to make himself understood is essential. Where an applicant is unable to do so, due to defendant's failure to provide competent interpreters, his case has been prejudiced.

### d. *Do Plaintiffs Have a Due Process Right to View Adverse Evidence and Cross–Examine Adverse Witnesses?*

Plaintiffs submit that they have a due process right to view adverse evidence and cross-examine adverse witnesses before a determination is made on their applications, citing *Goldberg v. Kelly,* 397 U.S. 254, 269–70, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1970) ("In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses"), and *Greene v. McElroy,* 360 U.S. 474, 496–97, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959) (same). Defendant responds that the Act does not provide for a formal hearing, nor does the SAW program involve the termination of benefits as in *Goldberg v. Kelly, supra.* Further, the procedures employed by the INS provide that plaintiffs be informed of the adverse evidence in the RPF's "intent to deny" letter and given an opportunity to submit additional documentary evidence to rebut it, prior to a final determination.

The Court must apply the three *Mathews* factors noted above, *i.e.,* (1) the interest at stake for the individual, (2) the risk of an erroneous deprivation of the interest through the procedures used and the probable value of additional or different procedural safeguards, and (3) the interest of the government in using the current procedures rather than additional or different procedures. *See Mathews v. Eldridge,* 424 U.S. at 335, 96 S.Ct. at 903.

Again, plaintiffs' interest in establishing their entitlement to adjustment under the SAW program is self-evident. However, the risk of an erroneous deprivation of plaintiffs' interest, due to the procedures in question, is less clear. Prior to the denial of a SAW application, the RPF informs the applicant of any adverse evidence which affects the application. The applicant has 30 days to submit any evidence to overcome the stated reasons for denial. So long as (1) the adverse evidence does not raise an irrebuttable presumption of fraud, *see supra,* (2) such evidence is properly disclosed to the applicant,

*see de la Llana–Castellon v. I.N.S.*, 16 F.3d at 1096; *Haitian Refugee Center, Inc. v. Nelson*, 694 F.Supp. at 880,[13] and (3) defendant engages in a "careful, individualized review of the evidence presented in [plaintiffs'] applications and [interview]," *Kaczmarczyk v. I.N.S.*, 933 F.2d at 595, this procedure does not pose a significant risk of error and comports with the requirements of due process. Moreover, the INS has a significant interest in maintaining a relatively simple adjudication procedure, which does not entail the delays and other difficulties inherent to the discovery process of full-blown litigation. *See Landon v. Plasencia*, 459 U.S. at 34, 103 S.Ct. at 330 (government has interest in efficient administration of immigration laws). Accordingly, the Court finds that plaintiffs do not have a due process right to view defendant's adverse evidence and cross-examine adverse witnesses.

### e. Do Plaintiffs Have a Due Process Right to a Written Transcript or Recording

■ Plaintiffs claim that they have a due process right to a written transcript or recording of their LO interviews, since the interview is "the only face to face encounter between the examiner and the applicant." Plaintiffs' Mem. of L. at 15. Moreover, plaintiffs state that the interviewers' notes are "generally sketchy and conclusory, and are entirely one-sided," but it is this record that accompanies the application to the RPF, LAU and even the Circuit Court of Appeals in an exclusion or deportation proceeding. *Id.*

Plaintiffs cite no authority for the proposition that due process requires that a written transcript or recording be made of LO interviews, and the Court has found none.[14] Moreover, application of the three *Mathews* factors, *supra*, leads us to a determination in favor of defendant on this point. Plaintiffs have not shown that there is a risk of erroneous deprivation of their interest in obtaining SAW status due to the lack of written transcripts or recordings. As noted above, the INS has a significant interest in employing a less formal adjudication procedure than that which one finds in a courtroom among litigants. Accordingly, the Court finds that plaintiffs do not have a due process right to written transcripts or recordings of their LO interviews.[15]

### CONCLUSION

Defendant's motion to dismiss or for summary judgment is denied. Plaintiffs' motion for summary judgment is granted to the extent set forth herein. Defendant is ordered to vacate the denials of plaintiffs' applications for SAW status and readjudicate plaintiffs' applications in accordance with the principles set forth in this Opinion and Order. Specifically, defendant is ordered to (1) provide plaintiffs with competent interpreters, (2) consider each plaintiff's application individually, without reference to a fraud profile based on ethnicity or national origin, and (3) afford plaintiffs the opportunity to rebut adverse evidence, without raising an irrebuttable presumption of fraud based on their employers' fraud in other cases.

SO ORDERED.

---

13. The facts in this case differed from those here in that plaintiffs were not given an opportunity to supplement their applications to support a suspect affidavit. Therefore, the Court ordered that, "[i]n those cases in which the INS considered evidence adverse to the applicant *of which the applicant was unaware* ... the INS shall vacate the denials, afford the applicant an opportunity to examine the adverse evidence, to rebut it, and to offer additional evidence before rendering a decision." 694 F.Supp. at 880 (emphasis supplied).

14. In *Equan v. I.N.S.*, 844 F.2d 276 (5th Cir. 1988), the Fifth Circuit held that "creating a summary of testimony rather than recording a hearing does not in itself implicate the due process clause." *Id.*, 844 F.2d at 279.

15. Plaintiffs do not allege that defendant has prohibited them from hiring stenographers to transcribe the interviews or from making their own audio recordings of the interviews.