**Robert E. OLSEN, Plaintiff,**

v.

**Warren M. CHRISTOPHER, et al., Defendants.**

**Civil Action No. 96–00570(CRR).**

United States District Court, District of Columbia.

April 23, 1997.

Robert E. Olsen, Plaintiff, pro se.

Sherri Evans Harris, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, appeared on the briefs, for Defendants.

**MEMORANDUM OPINION**

SPORKIN, District Judge.

The Plaintiff in this suit, Robert E. Olsen, brings this action against former Secretary of State Warren Christopher, in his official capacity, and certain other employees of the United States Department of State ("State Department"), alleging that he was separated from the Foreign Service in retaliation for opposing a visa adjudication system employed by the United State's Consulate Gen-

---

eral in São Paulo, Brazil that was "arbitrary, irrational and discriminatory."

Before the Court are the Defendants' Motion to Dismiss, Motion for Summary Affirmance of the Decision of the Foreign Service Grievance Board and oppositions and replies thereto. Also before the Court is the Plaintiff's "Motion for Judicial Abstention," Motion for *De Novo* Review and the Defendants' oppositions thereto. Upon careful consideration of the parties' pleadings, the entire record herein, and the law applicable thereto, and for the reasons set forth below, the Court shall direct the Secretary of State to investigate the use of codes to classify applicants for nonimmigrant visas based on certain aspects of their physical appearance. The Secretary of State shall submit to the Court a pleading setting forth its findings on or before May 30, 1997. The case shall be held in abeyance until the Secretary of State submits the requested information.

## BACKGROUND

### I. Statement of Facts.

The Plaintiff is an attorney who entered the Foreign Service after a nearly twenty-year career in business and law. After graduating from Harvard University in 1966, the Plaintiff received an M.A. in American civilization from the University of Pennsylvania, and completed all but the dissertation for a doctorate in that field. He later graduated from the University of Denver College of Law, served as the chief operating officer of an equipment leasing company and industrial bank, and practiced law for fifteen years in Denver, Colorado, specializing in securities law and litigation. Adm.R. 574.

In September 1990, the Plaintiff took and passed the written Foreign Service Officer examination. During 1991, he took and passed the oral Foreign Service Officer examination, and received medical and top secret security clearances. On January 6, 1992, the Plaintiff was appointed a Foreign Service Officer. New Foreign Service Officers receive a five-year limited appointment, during which they are to serve two or more tours of duty, at different posts and under different supervisors, before being reviewed by the Department for tenure and assignment to a functional career specialization. In this case, however, the State Department discharged the Plaintiff from employment for "unsatisfactory performance," on September 21, 1994, following his single abbreviated tour of duty as a consular officer at the U.S. Consulate General in São Paulo, Brazil. The Plaintiff's principal responsibility in that position was to adjudicate nonimmigrant visa applications.

The Plaintiff alleges that Defendant Thomas Lloyd, the head of the São Paulo visa unit and the Plaintiff's immediate supervisor, directed the Plaintiff and the three other consular officers under his supervision to note on nonimmigrant visa applications certain aspects of the applicant's physical appearance through a system of codes, and to base decisions to issue or deny nonimmigrant visas, in part or in whole, on those visual cues. First Amended Cmplt. ¶ 11, 20–25. For example, the visa officers were to place an "LP" on the application of an individual who "looks poor." An "LR" would be placed on the application of an individual who "looks rough." An "RK" would be placed on an application of a person who looks like a "rich kid." The post-specific profiling codes were incorporated into the Visa Officer's Manual.[1] Adm.R. 42.

The Plaintiff alleges that the codes and other written and unwritten criteria adopted by the Consulate's visa unit involved the consideration of an applicant's skin color, race or national origin in evaluating his or her application.[2] First Amended Cmplt.

---

**1.** The Visa Officer's Manual states the following: It is helpful to circle any doubtful items on the OF–156 so that other officers have an idea of why the applicant was g-ed. Officers sometimes use abbreviations on the forms:

> RK = Rich kid
> LP = Looks poor
> TP = Talks poor
> LR = Looks rough

TC = Take care

Adm.R. 42.

**2.** A Memorandum distributed to the United States posts in Brazil in April, 1993 suggested that visa officers should carefully scrutinize applications from persons with Arab or Chinese last names. The Memorandum suggested that:

¶ 21–22. The Plaintiff claims that the use of the codes to adjudicate nonimmigrant visa applications reflected notions held by Mr. Lloyd that: (1) dark-skinned Brazilians were "poorer" than light-skinned Brazilians, and, therefore, less likely to return to Brazil if allowed to enter the United States; and (2) members of certain ethnic groups, such as Chinese and Koreans, were more likely to engage in fraud.[3] *Id.*; Adm.R. 741.

Mr. Lloyd allegedly emphasized the use of profiles because it quickened the visa adjudication process. Mr. Lloyd and Ms. Lochman allegedly told the Plaintiff that he should spend a maximum of three minutes per interview with the large majority of cases. First Amended Cmplt. ¶ 45. Consul General Taylor, however, purportedly directed Mr. Lloyd and Ms. Lochman to change this standard out of a concern that profiles may be used as the sole basis of adjudication. *Id.*

The Plaintiff claims that he objected to using the codes, and in November 1992, began expressing his concerns about the policies in private meetings with, and communications to, his direct supervisor, Mr. Lloyd, Defendant Philip Taylor, serving then as the São Paulo Consul General, acting visa unit chief Laura Lochman, and consular section head Patricia Murphy. Adm.R. 47, 66, 449, 454, 505–25, 569, 578, and 853–54. After numerous discussions between the Plaintiff and his supervisors about the Plaintiff's objections to the visa adjudication system as well as his overall performance, Mr. Lloyd rated the Plaintiff's performance as unsatisfactory in a June 23, 1993 draft performance evaluation, stating that the Plaintiff "disagree[d] with our policy and has decided to do things 'his way', while paying lip service to authority." Adm.R. 78, 85–86, 120, 463–64. The narrative portion of the evaluation stated that the Plaintiff's visa decisions were

"routinely questionable," and that he "has a problem accepting authority." Adm.R. 83, 85. Mr. Lloyd further stated that he believed that the Plaintiff "well underst[ood] what is appropriate but refuses to do what everyone else in the section does because he simply does not agree." Adm.R. 86. That same day, Mr. Lloyd instructed the three other visa officers and a Brazilian employee of the visa unit to begin reviewing all of the Plaintiff's visa issuances and to report any departures from the post's "local policies." Adm.R. 464, 562.

Consul General Philip Taylor also allegedly criticized the Plaintiff for failing to adjudicate visa applications in the same manner as the other visa officers. Adm.R. 92. On June 30, 1993, Mr. Taylor gave the Plaintiff the draft employee evaluation prepared by Mr. Lloyd on June 23, 1993, and explained to the Plaintiff that he was given the interim report as an indication of where he needs to improve to be successful in his first assignment. Adm.R. 89.

On July 6, 1993, the consulate received a cable from Washington asking whether the Plaintiff should be administratively promoted to FP–4, effective August 11, 1993. The consulate replied by telegram dated July 7, 1993 that administrative promotion was not warranted because of the Plaintiff's poor performance, and that the post had prepared a draft evaluation of the Plaintiff, and had given the Plaintiff sixty days to raise his performance to the satisfactory level. Adm.R. 88.

Just thirteen days after the start of the "trial period," Mr. Taylor allegedly told the Plaintiff that it was "a virtual certainty" that he would be rated unsatisfactory at the end of it. Adm.R. 95, 112. In a July 19, 1993 Memorandum to Consul General Taylor, Ms. Murphy concluded "that Mr. Olsen's perfor-

---

Arab and Chinese last names set off bells and whistles, regardless of what passport/nationality they may have.

Adm.R. 519. The Memorandum gave a further warning:

Note: As we learned in two fraud investigations, it is very easy to assume a false identity in Brazil and obtain a genuine passport and nationality and other documents. Most Brazilians have no interest in doing so, but Arabs and Chinese are two groups to worry about.

Adm.R. 521.

3. The Visa Officer's Manual contains the following guidance:

*Korean/Chinese Fraud*
Major fraud; hard to check. In general, they are almost always called for an interview. Visas are rarely issued to these groups unless they have had previous visas and are older. Adm.R. 741.

mance falls far short of that which I would expect from an officer who has been on the job for over eight months. His deficiencies lie in the two core skills required to perform visa work—speed and judgment." Adm.R. 294. The sixty-day trial period was ended after thirty-seven days, and the Plaintiff was relieved of his visa adjudication responsibilities on August 13, 1993. First Amended Cmplt. ¶ 66.

On August 16, 1993, the Plaintiff received his Candidate Evaluation Report, which rated his performance as unsatisfactory. Adm.R. 55–61. The unsatisfactory rating triggered the procedures under State Department regulations for separation of officer candidates for unsatisfactory performance. The regulations state that while officer candidates usually are evaluated for tenure by a Commissioning and Tenure Board during their five-year limited appointment,

> in exceptional cases a candidate may, prior to Board review, prove unable to perform assigned duties satisfactorily.... In such circumstances, it serves neither the interest of the Service nor the individual to retain the candidate for the full trial period originally scheduled. In such instances, the Director General will terminate the candidate's appointment without delay, as authorized by section 611 of the Act.

3 FAM 578.1. Under 3 FAM 578.2, the Director General was required to review "all relevant and admissible material with respect to the [Plaintiff's] performance" and do one of the following: (1) change the rating to satisfactory; (2) direct the separation of the Plaintiff under section 611 (now 612) of the Act; or (3) provide an additional period of on-the-job observation.

By cable dated December 4, 1993, the Director General of the Foreign Service informed the Plaintiff that she had reviewed his most recent letter, as well as prior documentation provided by him and the Consulate. After a "thorough review" of the file, the Director General concluded that the evidence did not support overturning the finding of unsatisfactory performance, nor granting an additional period of observation. Accordingly, the Director General informed the Plaintiff that she had directed that action be taken under Section 611 of the Act to separate him from the Foreign Service effective January 30, 1994. Adm.R. 129.

## II. Administrative Appeals

The Plaintiff filed a grievance with the State Department on January 19, 1994, in which he claimed that the decision to separate him was contrary to law or regulation for a number of reasons, and that the performance report on which the decision was based contained omissions, errors and falsely prejudicial information. The State Department placed the Plaintiff's separation in abeyance until the grievance was decided. Answer ¶ 78. On July 8, 1994, the Department denied the grievance, but held the separation in abeyance for fifteen more days to permit the Plaintiff to appeal to the Foreign Service Grievance Board. Answer ¶ 82.

Still working in the São Paulo Consulate, the Plaintiff filed a grievance with the Foreign Service Grievance Board on July 27, 1994. Adm.R. 217. The Plaintiff stayed on the State Department's employment rolls until September 21, 1994, at which time the Board refused to extend the abeyance. On September 25, 1995, the Board issued a decision denying the Plaintiff's grievance in full. Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant Christopher's Motion For Summary Affirmance of the Decision of the Foreign Service Grievance Board, Exh. B.

## DISCUSSION

Whether the Plaintiff's poor performance evaluation and separation from the Foreign Service were the legitimate consequences of his unsatisfactory performance as a visa officer or the retaliatory acts of foreign service officers, it is clear from the record that the Plaintiff was separated from the Foreign Service because he failed to abide by the São Paulo Consulate's system for adjudicating nonimmigrant visa applications, not because he was incompetent.

Appearing in this action *pro se* the Plaintiff has shown through his pleadings and oral argument that he is intelligent and articulate. The record suggests that the Plaintiff's supe-

riors also found him so. Adm.R. 84–85. In the same manner, the Plaintiff's education, successful careers in law and business prior to joining the Foreign Service, his favorable evaluations from State Department employees in the U.S. Consulate in Porto Alegre, Brazil and in Washington, and even his ability to pass the Foreign Service Exam belie the notion that the Plaintiff did not have the intelligence to properly adjudicate visa applications.

Rather, it is much more likely that the slowness and poor judgment exhibited by the Plaintiff, if any, stemmed from his failure to employ the Consulate's time-saving profiling system, or to adopt the criteria urged upon him and his fellow visa officers. Defendant Lloyd concedes as much in his June 23, 1993 performance evaluation of the Plaintiff. Adm.R. 86. If, for example, the Plaintiff believed that the Consulate was wrongfully denying visas to a whole class of visa applicants and, in defiance, issued visas to members of that class, his supervisors naturally would find that he exercised poor judgment in his decisions to issue and deny visas. If, for example, the Plaintiff refused to employ the system of profiling adopted by the Consulate (as both sides agree he did), which allows the visa officers to speed up the adjudication process through reliance on visual cues, then the Plaintiff naturally would take more time to adjudicate applications than visa officers relying more heavily on visual cues. In short, while it is possible that the Plaintiff was separated from the Foreign Service for processing applications too slowly, for poor judgment or for refusing to follow the directions of his supervisors, it is unlikely that he was separated because he lacked the ability to perform the tasks of a visa officer.

Therefore, two related questions appear to be at the heart of this dispute: (1) Was the Plaintiff justified in refusing to adopt the Consulate's system for adjudicating visa applications? and (2) Was the system for adjudicating visa applications a legitimate practice or a violation of federal law or State Department policy?

The Court takes seriously the Plaintiff's allegations that the profiling system results in actions taken based on skin color, race and national origin. At issue is the São Paulo Consulate's practice of relying heavily on visual cues when adjudicating nonimmigrant visa applications. The administrative record contains evidence that visas were issued and denied largely on how rich or poor the applicant appeared.

Of concern is the possibility that skin color, race or national origin played a role in the adjudication of nonimmigrant visa applications. Even if the codes, such as "LP" for "looks poor" or "LR" for "looks rough," literally refer to indicia of socio-economic status as considerations in issuing and denying visas, the Plaintiff makes a compelling argument that such codes are as tied to skin color, race and national origin as they are to dress or other indicia of wealth. It is a disturbing reality that in many countries, such as Brazil and even the United States, certain ethnicities are disproportionately represented among the poor. The issue is what, if any, consideration can a Cabinet agency of the federal government give to skin color, race or national origin when determining the socio-economic status of a visa applicant.

In order to better understand the visa adjudication system challenged by the Plaintiff, the Court shall request the Secretary of State to investigate the nature and extent of visa applicant "profiling" by State Department officers. The Secretary shall submit a pleading to the Court, setting forth its findings on the following: (1) what internal State Department procedures govern the adjudication of nonimmigrant visa applications; (2) how much discretion is accorded visa officers under the law in issuing and denying nonimmigrant visas; (3) which embassies and consulates employ a profiling system that allows visa officers to consider visual cues in issuing or denying visas; (4) what visual cues or other codes are employed by embassies and consulates using a profiling system; (5) how much weight are visa officers allowed to place on visual cues or other profiling codes in adjudicating nonimmigrant visa applications; (6) whether profiling codes, such as those purportedly used by the São Paulo Consulate, comport with the law and State Department procedures and processes; (7)

the extent to which the State Department protects such profiling systems from resulting in race-based decisions with respect to nonimmigrant visa applications; (8) what is the reason, if any, for using codes rather than specifying precisely the reason for issuing or denying a visa; (9) the identity of the highest State Department officer who is aware of the use of "profiling" codes and has approved their use; (10) whether the legitimacy of the São Paulo Consulate's profiling system was considered and addressed in the Foreign Service Grievance Board's adjudication of the Plaintiff's grievance; and (11) what, if any, consideration was given to treating the Plaintiff's actions as those of a whistle blower.

## CONCLUSION

The Court needs the information requested in order to appropriately adjudicate the Plaintiff's case. The record in this case raises the possibility that the State Department did not seriously consider that the Plaintiff's actions were more akin to those of a whistle blower, misguided or not, than those of an incompetent Foreign Service officer who could not meet the demands of his assignment.

For the reasons stated, the Court will request the Secretary of State to submit to the Court a pleading detailing its findings on the issues described herein on or before May 30, 1997. The case will be held in abeyance until the Court has received the requested information. The Court will issue an order of even date consistent with the foregoing Memorandum Opinion.