**Robert E. OLSEN, Plaintiff,**

v.

**Madeline ALBRIGHT, et al., Defendants.**

**Civil Action No. 96–570(SS).**

United States District Court, District of Columbia.

Dec. 22, 1997.

David Newmann, Hogan & Hartson, L.L.P., Washington, DC, for Robert E. Olsen.

Robert E. Olsen, Arlington, VA, pro se.

Fred E. Haynes, Sherri Lanette Evans, Suzanne Claire Nyland, U.S. Attorney's Office, Washington, DC, for Warren M. Christopher.

Suzanne Claire Nyland, U.S. Attorney's Office, Washington, DC, for Madeline Albright.

Sherri Lanette Evans, Suzanne Claire Nyland, U.S. Attorney's Office, Washington, DC, for Philip Taylor and Thomas Lloyd.

### *MEMORANDUM OPINION*

SPORKIN, District Judge.

This matter is before the Court on Plaintiff's motion for summary judgment on Count I of his First Amended Complaint. In that Count, Plaintiff, a former member of the United States Foreign Service, seeks a determination that Plaintiff's termination by the United States Department of State ("State Department") was unlawful. Plaintiff further attacks the decision of the Foreign Service Grievance Board ("Board" or "Grievance Board") upholding that termination as unlawful. Plaintiff joined the Foreign Service on January 6, 1992. He served his first tour of duty in the Foreign Service at the United States Consulate General in Sao Paulo, Brazil ("Consulate") as an adjudicator of visas. Plaintiff claims that he was terminat-

ed because he objected to and refused to follow "profiles" that required him to adjudicate visas on the basis of the applicant's race, ethnicity, national origin, economic class, and physical appearance. Plaintiff seeks reinstatement in the Foreign Service with back pay, benefits, and scheduled administrative promotions.

This Court grants Plaintiff's motion in part. The administrative record indicates that the Grievance Board did not properly address the question of the legality of the Consulate's visa policies when it reviewed Plaintiff's termination. On their face, these profiles are contrary to law because they make generalizations based principally on the basis of race, ethnicity, and national origin. The Plaintiff had the right to voice his objections to these policies and not be discharged for refusing to apply them. The Board failed to address this issue in its decision. As a result, the Court finds that the Board's decision was "arbitrary," "capricious," and contrary to law within the meaning of the Administrative Procedure Act ("APA"), § 706(2)(A). Accordingly, the Court will remand the matter to the Grievance Board for a reconsideration of its decision of Plaintiff's termination in light of this Court's decision.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff graduated from Harvard University. Afterwards, he completed all but the dissertation requirement for a doctorate in American civilization at the University of Pennsylvania. Plaintiff then went to law school at the University of Denver College of Law. After receiving his law degree, he practiced law for fourteen years before joining the Foreign Service on January 6, 1992, at age forty-seven. Plaintiff was appointed to serve an initial five-year term, at the end of which he would become eligible for tenure and a career appointment. On October 29, 1992, following the completion of his training, Plaintiff began a tour of duty at the Sao Paulo Consulate He was assigned to serve as one of four consular officers primarily responsible for adjudicating applications for nonimmigrant visas. Plaintiff's direct supervisor at the Consulate was Thomas Lloyd, chief of the Consulate's visa unit.

The Consulate had established various policies which all officers were required to follow in adjudicating eligibility for nonimmigrant visas. Some of the policies focused on the applicant's physical appearance and economic status. According to the Consulate's manual:

It is helpful to circle doubtful items on the [visa application form] so that other officers have an idea of why the applicant was g-ed. Officers sometimes use abbreviations on the forms:

RK = Rich kid
LP = Looks poor
TP = Talks poor
LR = Looks rough
TC = Take care

A.R. 740. Some of the stated reasons for the denial of visas included: "Slimy looking[;] wears jacket on shoulders w/ earring," A.R. 527; "LP", A.R. 531, 538; "*LP!!!!!,*" A.R. 534 (emphasis in original); "*LR*" A.R. 536 (emphasis in original); "Look Really Poor," A.R. 544; "L[ooks] Scary," A.R. 556; "*Bad* Appearance. Talks *POOR,*" A.R. 854 (emphasis in original); and "Looks + talks poor." *Id.*

In addition to the codes based on physical appearance and economic status, the Consulate's policies focused on the race, ethnicity, place of birth, and national origin of applicants. For example, the Consulate's manual provided:

KOREAN/CHINESE FRAUD

Major fraud; hard to check. In general, they are almost always called for an interview.

Visas are rarely issued to these groups unless they have had previous visas and are older.

A.R. 741.

The manual also distinguished among applicants based on place of birth within Brazil. After identifying various cities "known for fraud"—most of them with predominantly black populations—the manual states: "anyone born in these locations is suspect unless older, well-traveled, etc." A.R. 741.

In addition to the manual, an April 1993 memorandum distributed to the consulates in Brazil states in pertinent part: "Arab and Chinese last names set off bells and whistles, regardless of what passport/nationality they may have." A.R. 519. The memorandum further states that "it is very easy to assume a false identity in Brazil and obtain a genuine passport and nationality and other documents. Most Brazilians have no interest in doing so, but Arabs and Chinese are two groups to worry about." A.R. 521. According to Consular Section Head Patricia Murphy: "Another body of guidelines is not post-specific but nationality-specific[.] [F]or example, Filipinos and Nigerians have high fraud rates, and their applications should be viewed with extreme suspicion, while British and Japanese citizens rarely overstay, and generally require less scrutiny." A.R. 289.

Plaintiff believed that the policies were not only improper, but also illegal. Disturbed by the policies, he began to document some of the particular cases which he found troubling. Plaintiff brought his complaints to Lloyd and Murphy. Plaintiff considered the Consulate's visa adjudication guidelines to be legally questionable and objected to basing his decisions on these policies. According to a March 10, 1993 memorandum by Laura Lockman, an officer at the Consulate, the Plaintiff was quoted as saying "that decisions should be made on facts going deeper than the profile information," A.R. 668. After a temporary assignment in April 1993 to the visa unit at the Consulate in Porto Alegre, Brazil, Plaintiff wrote an April 27, 1993 memorandum to Murphy. It stated that "Porto Allegre uses the personal appearance of applicants simply as a rough check of their documentary evidence. Sao Paulo, on the other hand, ... relies heavily on the appearance of applicants." A.R. 508. On his copy of the memorandum, Lloyd added the following handwritten comment: "His criticisms of most everything we do in the visa section in Sao Paulo are implicitly apparent." A.R. 505.

Lloyd and Lochman informed Plaintiff that they disapproved of his judgment in particular cases because he had issued visas "to typical post fraud profiles." A.R. 654.

Plaintiff had a lower refusal rate and interview speed than other officers. A.R. 653–56. Lloyd and Lochman told Plaintiff that he should spend approximately three minutes per interview and that he should attempt to achieve a thirty percent refusal rate. To achieve these goals, they said, Plaintiff should base his judgment on the profiles. A.R. 45, 653.

Plaintiff's supervisors and fellow officers grew increasingly resentful of his disagreement with their adjudication policies. According to Murphy's later description of her and the others' reactions to the Plaintiff, the Plaintiff was refusing to be "a part of the system" and was contesting the decisions of other officers on visa denials. "In some ways, Bob's problems here have been because he refuses to compromise with his own convictions." A.R. 292.

In June 1993, Lloyd discussed the situation with Consul General Philip Taylor, who instructed Lloyd to prepare a draft Candidate Evaluation Report ("CER") on the Plaintiff. A.R. 645. On the CER form, Lloyd checked boxes stating that Plaintiff's performance failed to meet most requirements of the job and that Plaintiff was unlikely to serve effectively even with additional experience. A.R. 78–79. Lloyd stated that Plaintiff "disagrees with our policy and has decided to do things 'his way.'" A.R. 85. On July 7, 1993, in response to an inquiry from the State Department concerning Plaintiff's scheduled administrative promotion, Taylor advised the State Department by cable that a promotion was not warranted at that time because Plaintiff's performance had been unsatisfactory. A.R. 88. Plaintiff was given "an additional period of 60 days to raise his performance to a satisfactory level." A.R. 88.

Thirteen days after the start of Plaintiff's 60-day trial period, Murphy issued a memorandum of July 19, 1993, which stated: "Based on his performance to date and on my close personal observation during the thirteen-day period, I do not believe that Olsen can effectively meet the requirements of his position." A.R. 288. On August 16, 1993, Lloyd submitted a final CER to Taylor, A.R. 59, which rated Plaintiff's performance as unsatisfactory. Murphy informed the

Plaintiff that effective immediately, he should stop working in the visa unit and begin working in the American Citizen Services section. A.R. 102. On October 9, 1993, the Director General formally notified Plaintiff that she had received the final CER and invited Plaintiff to submit comments in response. Plaintiff stated that he believed the Consulate's policies were "inconsistent with the law" and were "based on sterotyped notions of appearance" and "ethnic, gender, class or age stereotypes." A.R. 126. On December 6, 1993, the Director General informed Plaintiff that he was to be terminated from the Foreign Service effective on January 30, 1994.

On January 19, 1994, Plaintiff submitted a grievance contesting his impending termination from the Foreign Service. The filing of the grievance suspended his pending termination. On July 8, 1994, the State Department denied Plaintiff's grievance. On April 30, 1994, Plaintiff left the Sao Paulo tour and was assigned to the State Department's Internal Organization Affairs Bureau ("IO") in Washington, D.C.

While at the IO, Plaintiff continued to contest his pending separation from the Foreign Service. Plaintiff submitted his grievance to the Grievance Board on July 26, 1994 and on July 27, 1994, he requested a hearing in the matter. On August 12, 1994, a Board staff member issued an interim decision denying Plaintiff further prescriptive relief. Plaintiff was separated from the Foreign Service on September 21, 1994. On September 25, 1995, the Board denied Plaintiff's request for a hearing and Plaintiff's grievance. The Board concluded that "the practice of establishing local post-specific guidelines is not a violation of law" and that the Consulate's assertions regarding "grievant's poor judgment and resistance to post-specific guidelines" supported the unsatisfactory rating. Board Dec. At 31.

Plaintiff, pro se, filed a complaint in Federal District Court on March 22, 1996. On April 23, 1997, this Court issued a Memorandum Opinion concerning: (1) Defendants' Motion to Dismiss; (2) Motion for Summary Affirmance of the Decision of the Foreign Service Grievance Board; and (3) oppositions and replies thereto. *See Olsen v. Christopher,* 962 F.Supp. 5 (1997). The Court, concerned about Plaintiff's allegations that the Consulate's policies were discriminatory, requested additional information from the Department of State regarding its policies. *See id.* at 9–10. On July 23, 1997, the Defendants filed the Declaration of Marc Gorelick, Acting Director, Office of Fraud Prevention Programs, Bureau of Consulate Affairs, in response to the Court's queries. Mr. Gorelick stated that the Consulate's policy of scrutinizing more intensely the visa applications of Chinese, Arabs, and Koreans was appropriate because of the high fraud rates among these nationalities. *See* Declaration of Marc Gorelick (July 23, 1997), at 3.

Up to this point, Plaintiff was appearing pro se. Subsequently, he obtained pro bono counsel. The Court deemed it appropriate to dismiss all of the outstanding motions in the case without prejudice so that Plaintiff would have the opportunity to respond with counsel. *See* Court's Order of October 9, 1997. This matter is now before the Court on Plaintiff's motion for summary judgment on Count I of his First Amended Complaint.

## II. ANALYSIS AND DISCUSSION

Plaintiff seeks summary judgment on Count I of his First Amended Complaint. In Court I, Plaintiff alleges: (1) that the Department of State's actions in separating Plaintiff from the Foreign Service violated § 706(2) of the APA; and (2) that the subsequent denial of Plaintiff's grievance by the Grievance Board violated § 706(2) of the APA.

Plaintiff offers four arguments in support of his motion. First, Plaintiff claims that the undisputed facts in the administrative record before the Board establish that the Defendant terminated Plaintiff because he objected to and refused to follow the Consulate's discriminatory visa policies. Second, Plaintiff contends that Board erred in concluding that "although the foreshortening of grievant's [60–day] trial period was a procedural error, it was not a substantial factor in the agency's decision to separate him from the Service." Bd. Dec. at 34. Third, Plaintiff alleges that the Grievance Board abused its discretion and acted contrary to law in refusing to

grant him a hearing before it issued its final decision. Fourth, Plaintiff claims that the Board erred in concluding that the State Department's Director General was not required to provide Plaintiff with a statement of reasons for her decision to terminate Plaintiff.

## A. Standard of Review

■ Section 1110 of the Foreign Service Act of 1990, as amended, 22 U.S.C. § 4140, provides for judicial review of final decisions of the Foreign Service Grievance Board in federal district court pursuant to the APA. The pertinent section of the APA, § 706(2), defines the applicable standard of judicial review for the Grievance Board's decision:

> [T]he reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law;
>
> (E) unsupported by substantial evidence in a case subject to 5 U.S.C. §§ 556 and 557 or otherwise reviewed on the record of an agency hearing provided by statute;
>
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In reviewing the Board's determination, the Court is not empowered to "substitute its judgment" for the Board's decision. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Nevertheless, the Court

is required to give the Board's decision "a thorough, probing, in-depth review." *Id.* at 415.

■ The Board's decision is "arbitrary," "capricious," or contrary to law within the meaning of § 706(2)(A) if the Board has entirely failed to consider an important aspect of the problem or has offered an explanation for its decision that runs counter to the evidence before it. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

## B. Application of the Standard of Review

The Court concludes that the Board's decision was arbitrary, capricious, and contrary to law within the meaning of § 706(2)(A). The decision of the Board rests on essentially three grounds: (1) Plaintiff's slow speed in adjudicating visas; (2) Plaintiff's poor judgment in adjudicating visas; (3) Plaintiff's refusal to follow the Consulate's policies.[1] The Board's decision is based in large part on its evaluation of Plaintiff's judgment in adjudicating visas and Plaintiff's refusal to follow the Consulate's policies:

> The Board concludes that, on the basis of ample documentation in the record, grievant's poor judgment and resistance to post-specific guidelines has been well established. It is hard to fault the opinion of grievant's supervisors that his performance in what is the core of a visa officers [sic] job, *i.e.,* deciding whether an applicant is eligible to receive a visa, was clearly unsatisfactory. Bd. Dec. at 31.

Underlying the Board's interpretation of Plaintiff's judgment and resistance to the Consulate's policies is the issue that is at the heart of this case: the legality of the Consulate's visa policies. Under 5 U.S.C. § 2302(b)(9)(D), made applicable to the State Department by 22 U.S.C. § 3905(b)(4), the

---

**1.** Plaintiff contests the Board's findings as to his interview speed and his judgment. He claims that these reasons for his determination are pretextual, and that the real reason is the fact that he voiced objections to the Consulate's policies. Plaintiff argues that his termination violated the First Amendment, which prohibits retaliation against an employee for "speaking on a matter of public concern." *Tao v. Freeh,* 27 F.3d 635, 639

(D.C.Cir.1994), and 22 U.S.C. §§ 3905(b)(2) and (3) which prohibits the State Department from taking adverse action against an officer for disclosing information which the member reasonably believes evidences a violation of any law, rule, or regulation, or abuse of authority. Because the Court is vacating and remanding the Grievance Board's decision on another ground, the Court will not address this issue.

State Department may not "take ... any personnel action against any employee ... for refusing to obey an order that would require the individual to violate a law." Although the Board never explicitly addressed the legality of the Consulate's policies, this issue is essential to how Plaintiff's judgment and job performance are to be interpreted. If the policies are clearly valid, then the Board's decision is quite reasonable, for Plaintiff appears rather insubordinate. If, on the other hand, the policies are unlawful, then Plaintiff's conduct must be interpreted in an entirely different light. Rather than being uncooperative, Plaintiff appears to be exercising his right to refuse to obey illegal orders while at the same time attempting to meet the demands of his superiors.

### 1. *The Consulate's Policies*

■ An initial look at the Consulate's policies suggests that they are suspect. The policies instruct visa officials to rely heavily upon factors such as physical appearance and national origin when adjudicating the applications of visa applicants. The Consulate's policies establish fraud profiles that are centered around particular nationalities that are deemed inherently suspicious and extremely likely to engage in fraud, Plaintiff was disturbed about these policies, and the administrative record suggests that he attempted to avoid using them as he dispatched the duties of his position. In fact, the Court concludes that the Consulate's policies are unlawful and that Plaintiff was justified in refusing to follow them.

Although the Constitution clearly prohibits discrimination on the basis of race, ethnicity, or national origin, the Supreme Court declared that "the power to expel or exclude aliens [is] a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Shaughnessy v. Mezei*, 345 U.S. 206, 210, 73 S.Ct. 625, 97 L.Ed. 956 (1953). During most of its history, the United States openly discriminated against individuals on the basis of race and national origin in its immigration laws. The oldest naturalization laws only permitted "free white persons" to be eligible for United States Citizenship. *See* Charles Gordon et al. *Immigration Law and Procedure* § 95.01[2] (1997). The Chinese Exclusion Act of 1882 expressly excluded Asians from immigrating. *See* Act of May 6, 1882, ch. 126, 22 Stat. 58, repealed by Act of Dec. 17, 1943, ch. 344, 57 Stat. 600. The Immigration Act of 1924 established quotas based on nationalities, resulting in a disproportionate exclusion of Africans and Asians. *See* Immigration Act of 1924, ch. 190, 43 Stat. 153 (amended 1952).

Throughout the latter half of the Twentieth Century, Congress moved away from such discriminatory policies. The most profound change was the Immigration and Nationality Act Amendments of 1965. *See* Pub.L. 89–236, 79 Stat. 911. That Act eliminated discrimination on the basis of race and national origin. Pursuant to 8 U.S.C. § 1152(a)(1)(A), "[N]o person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence." The legislative history surrounding the 1965 Act is replete with the bold anti-discriminatory principles of the Civil Rights Era. Indeed, the 1965 Act was passed alongside the Civil Rights Act of 1964 and the Voting Rights Act of 1965.

The Government does not contend that the Consulate is permitted to engage in discrimination on the basis of race, ethnicity, or nationality; rather, the Government maintains that the Consulate's policies are not discriminatory. The Government argues that the notations about an applicant's physical appearance, such as "Looks Poor," "Looks Rough," etc., are used only to inform the interviewing officer as to why another consular officer believes that an interview should be conducted. Visas are denied not solely based upon these notations; rather, the appearance of the applicant is merely one factor in the decision. To support its position, the Government points out that many of the cases that Plaintiff complained about ultimately concluded with an approval after the interview. Further, the Government claims that the statements that Koreans, Chinese, and Arabs are likely to be committing fraud are not designed to serve as grounds to exclude these groups from obtaining visas.

These generalizations based on nationality are used only to alert the visa officers of the potential for fraud and instruct them to be more careful in their examination of individuals with such national origins.

The Court finds that the Consulate's policies were not as benign as the Government contends. The administrative record contains substantial evidence that physical appearance played a large role in visa determinations. Although codes such as "Looks Poor" and "Looks Rough" appear only to concern an applicant's economic status, the reality is that in many countries, such as Brazil and the United States, certain ethnicities are disproportionately represented among the poor. As Plaintiff observed in a letter to the Board paraphrasing and complaining about the policies: "The applicant's race or skin color, dress and personal appearance, and demeanor are usually surer indications of his or her economic class than the information contained in any documents. Especially in adjudicating without interviews, officers should deny visas to persons who 'look poor,' 'look rough,' or 'look slimy.' ... Dark-skinned Brazilians 'look poor' because a disproportionately large percentage of Brazilian 'pardos' (racially mixed) and 'pretos' (blacks) are in fact poor." A.R. 452–53.

The Consulate's policies are discriminatory because they are strongly based on impermissible generalizations and stereotypes, not because these factors are the sole and exclusive reason for denying a visa application. The singling out of applicants for additional scrutiny based upon a discriminatory profile—which is likely to increase the possibility of visa denial—is sufficiently burdensome to cause a substantial injury to these groups. If the profiles really did not have much effect on the visa adjudicatory process, then there would be no need to use them. It is precisely because the Consulate deemed the profiles especially useful in identifying cases of fraud that they were used.

The most disturbing elements of the Consulate's policies are the statements in the manual and the April 1993 memorandum concerning applicants of specific nationalities. Although these passages do not explicitly instruct the visa officer to deny their applica-

tions, they suggest that the applications of individuals from these groups should be denied. For example, the manual provides that for Korean and Chinese applicants, "Visas are rarely issued to these groups unless they have had previous visas and are older." The manual declares that they engage in "[m]ajor fraud" that is "hard to check." Implicit in this passage is the strong suggestion that visas for Korean and Chinese applicants should be given only rarely.

Although the Government argues that these stereotypes are only used to determine which applicants should receive interviews, see Declaration of Marc Gorelick (July 23, 1997) at 10–11, the passages in the manual suggest that the stereotypes play a much greater role. Despite the fact that the generalizations and stereotypes based on race and national origin are not used to deny applications outright, their effects are still extremely pernicious. The statements in the manual inculcate visa officers to pre-judge certain groups solely on the basis of their nationality or physical appearance. The Consulate's policies instruct visa officers to view members of these groups as far more suspicious and dishonest than applicants of other races and nationalities. In effect, the manual places a heavy additional burden on applicants of particular nationalities and races that other individuals do not have to face. Based on generalized stereotypes about their behavior, Koreans, Chinese, and Arabs are singled out and stamped with the ignominious badge of "major fraud" before any facts about them are known.

The Government contends that the fraud profiles are necessary to prevent nonimmigrant visa fraud among groups likely to commit such fraud. The State Department claims that Chinese and Korean immigration fraud rings operating in Brazil are a major problem. In his Declaration in support of the Consulate's policies, Mr. Gorelick pointed out numerous instances and types of visa fraud in Brazil among Chinese, Koreans, and Arabs. See Declaration of Marc Gorelick (July 23, 1997). Although the Court understands the difficulty of the Consulate's task, greater efficiency is not a sufficient reason to justify the discrimination of people based

upon their skin color or national origin. *See, e.g., Chan v. I.N.S.*, 631 F.2d 978, 983–84 (D.C.Cir.1980) (denial of permanent residency to alien who overstayed nonimmigrant visa may not "rest[ ] on an impermissible basis such as an invidious discrimination against a particular race or group."). *Patel v. I.N.S.*, 811 F.2d 377, 382 (7th Cir.1987); *United States v. Slocum*, 464 F.2d 1180, 1184 (3d Cir.1972) (profile used to identify possible airplane hijackers may "not discriminate against any group on the basis of religion, origin, political views, or race"). *Whitfield v. Board of County Comm'rs of Eagle County*, 837 F.Supp. 338, 344 (D.Colo.1993) ("it is wholly inappropriate to define a class as suspects" on the basis of race).

The principle that government must not discriminate against particular individuals because of the color of their skin or the place of their birth means that the use of generalizations based on these factors is unfair and unjustified. In *Abdullah v. I.N.S.*, 921 F.Supp. 1080, 1093–94 (S.D.N.Y.1996), illegal Indian and Pakistani aliens sought temporary residence under the Special Agricultural Worker amnesty program. They alleged that the INS had impermissibly denied their applications for adjustment of status "on the basis of membership in ethnic groups predetermined to be suspected of fraud." 921 F.Supp. at 1083–84. In recommending denial of applications, INS officers provided explanations along the following lines:

> The applicant fits the 'profile' of highly suspect applicants of Indian/Pakistani nationality all coming from the region of Punjab. Due to past experiences involving the above applicants ..., we have reason to suspect that the documents presented by such applicants may have been obtained fraudulently. *Id.* at 1094, 1096.

In light of these explanations, the court found "that many of plaintiffs' applications were adjudicated by the [INS], in whole or in part, with reference to a profile based on their identity with a particular group." *Id.* at 1096. The court concluded: "Such adjudication violates our most basic principles and has no place in a process designed to afford an applicant a certain amount of individual consideration." *Id.* at 1096. "The use of a fraud profile on ethnicity unquestionably ... deprive[s] applicants of the individualized determination ... to which they are entitled." *Id.* at 1093–94.

The Court is aware of the State Department's difficult responsibilities in adjudicating visa applications under strict time constraints. However, the Court is confident that the State Department can dispatch its duties effectively without using generalizations based on national origin. This nation's officials once deemed it necessary to make the broad generalization that American citizens of Japanese origin were inherently suspect and likely to commit espionage. Recently, the United States recognized that this was a terrible error: "A grave injustice was done to American citizens and resident aliens of Japanese ancestry who, without individual review of any probative evidence against them, were excluded, removed and detained by the United States during World War II." *Personal Justice Denied,* Report of the Commission on Wartime Relocation and Internment of Civilians 18 (1982). Although this country has come quite far in stamping out discrimination in all its laws and policies, some vestiges still remain. In this case, the Consulate's visa policies stand in direct opposition to the progress this country has made in eliminating discrimination in the context of immigration law. Accordingly, the Court concludes that the Consulate's visa policies are in violation of law and that Plaintiff was more than reasonable in his protests of them.

### 2. *Plaintiff's Job Performance*

The Grievance Board's decision fails to address adequately the issue of the legality of the Consulate's policies in interpreting Plaintiff's job performance. Not only does the Board's decision fail to address this issue directly, it fails even to consider the reasonableness of Plaintiff's belief that the policies were illegal and the impact of Plaintiff's belief on his performance. The administrative record suggests that many of the complaints about Plaintiff's performance were indirectly, and sometimes directly, caused by Plaintiff's refusal to follow the Consulate's offensive policies. As evidence of this fact, the administrative record reveals numerous instances

where Plaintiff's superiors, in instructing Plaintiff how he should improve his performance, told him to rely more heavily on the profiles. *See* A.R. 45, 681, 57. The administrative record indicates that Plaintiff's attitude toward the Consulate's policies was a major aspect of the problems identified in his job performance.

The law recognizes that government employees are not to follow orders blindly. Congress expressly gave government employees the right to refuse to follow orders requiring them to engage in illegal acts without fear of retaliation. Pursuant to 5 U.S.C. § 2302(b)(9)(D), an employee shall not be subject to personnel action "for refusing to obey an order that would require the individual to violate the law." With the complexity of our laws, the legality or illegality of certain orders is often an ambiguous issue. Ultimately, employees must exercise good judgment in determining whether an order requires them to violate the law. The law does not permit employees to second-guess every order or to sit as judges of the legality of government policies. Nevertheless, Congress contemplated that there would be certain instantes when a government employee would be asked to violate the law, and Congress determined that government would function best if each employee exercised good judgment and respect for the law rather than follow orders blindly and thoughtlessly. These instances cannot be identified by a categorical formula; rather, they must be determined in a case-by-case manner.

In this case, Plaintiff faced the difficult tension of carrying out the responsibilities of his job while trying to avoid applying policies he rightly concluded were improper. The Court, understanding the complicated position in which Plaintiff found himself, instructs the Grievance Board to recognize his plight. It is interesting that when Plaintiff was performing his temporary assignment at the Porto Alegre Consulate, he acquitted himself in exemplary fashion. Plaintiff's job performance during his assignment in Porto Allegre received the following review:

> Robert, in that classic Foreign Service cliche, "hit the ground running." He needed very little time to adjust to our proce-dures, and quickly became integrated. He went through the day's workload with dispatch, and to my eye appeared to apply consistency and good judgment to each visa case. A.R. 54.

## III. CONCLUSION

The Court will grant Plaintiff's motion for summary judgment on Count I of his First Amended Complaint. The Court concludes that the Grievance Board's decision was arbitrary, capricious, and contrary to law within the meaning of 5 U.S.C. § 706(2)(A). The Board's decision rested upon its assumption of the legality of the Consulate's policies. This was in error. The Court also believes that because the Board did not properly consider the legality of the Consulate's policies, Plaintiff's other contentions have merit. These contentions include Plaintiff's claims: (1) that his 60-day trial period was improperly shortened; (2) that the Grievance Board erred in refusing to grant him a hearing; and (3) that the Board erred in concluding that the State Department's Director General was not required to provide Plaintiff with a statement of reasons for Plaintiff's termination. For these reasons, the Board's decision will be vacated and the matter remanded to it for further consideration in light of this Court's decision.

Because the Court's referral of this matter back to the Grievance Board has the potential of granting Plaintiff all appropriate relief, the Court will dismiss without prejudice the other counts in Plaintiff's complaint. Pending the action of the Grievance Board, the Court will retain jurisdiction of this matter to order such other and further relief as may be necessary.

An appropriate order accompanies this Memorandum Opinion.

## ORDER

This matter is before the Court on Plaintiff's motion for summary judgment on Count I of his First Amended Complaint. For the reasons stated in the preceding Memorandum Opinion, the Court will grant Plaintiff's motion. Accordingly, it is hereby

**ORDERED** that Plaintiff's motion for summary judgment on Count I of his First Amended Complaint be **GRANTED.** It is further

**ORDERED** that the decision of the Grievance Board be **VACATED** . It is further

**ORDERED** that this matter be **RE-MANDED** to the Grievance Board for reconsideration in light of the Court's opinion. It is further

**ORDERED** that the Grievance Board shall make its decision within 60 days of this Memorandum Opinion. It is further

**ORDERED** that pending the Grievance Board's determination, the Court will hold in abeyance Plaintiff's request for reinstatement and back pay. It is further

**ORDERED** that the additional counts in Plaintiff's First Amended Complaint be **DIS-MISSED** without prejudice. The Court will retain jurisdiction of this matter to order such other and further relief as may be necessary.